NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0390n.06
Filed: June 12, 2007

No. 06-3926

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| NDEYE NGONE DIEYE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ON PETITION FOR REVIEW OF AN |
| | ) | ORDER OF THE BOARD OF |
| ALBERTO R. GONZALES, Attorney | ) | IMMIGRATION APPEALS |
| General, | ) | |
| | ) | |
| Respondent. | ) | |

Before: GIBBONS, COOK, Circuit Judges; and CLELAND, District Judge.[*]

COOK, Circuit Judge. Ndeye Ngone Dieye, a native and citizen of Senegal, petitions for review of the Board of Immigration Appeals' (BIA) denial of her application for withholding of removal and protection under the Convention Against Torture (CAT). The BIA adopted and affirmed the immigration judge's (IJ) determination that Dieye was not credible and that she did not meet her burden of proof for withholding of removal or for protection under the CAT. For the following reasons, we deny the petition.

I

[*]The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

Dieye entered the United States as a non-immigrant visitor in April 2002. According to her testimony before the IJ, she initiated several failed attempts to file for asylum through two apparently unscrupulous organizations in New York and North Carolina that offer to complete immigration filings for would-be asylum applicants. Dissatisfied with having paid nearly a thousand dollars to these organizations to no effect, Dieye abandoned her efforts until an immigration news story spurred her to attempt to file again. With the assistance of another asylum-filing organization in Columbus, Ohio, she successfully filed her application for asylum, withholding of removal, and relief under the CAT in October 2004, more than two years after her arrival in this country. A Department of Homeland Security (DHS) asylum officer interviewed Dieye in November 2004 and referred her to proceedings before an IJ. The DHS then placed her in removal proceedings by serving her with a notice to appear.

Dieye's testimony before the IJ focused on her alleged experiences of political persecution in Senegal. Dieye claims to be the founder and vice president of the Movement for Free Women, a group in Senegal that opposes, as she phrased it, "the mutilation of the women and the submission of the women." The Movement's activities are somewhat difficult to discern, as Dieye testified that the group "didn't have any particular activities," but that they "were getting together [to] talk business about how [they] could do to solve some problems and help each other." According to Dieye, the Senegalese government expressed some form of disapproval of the group, or at least declined to recognize it formally. The IJ pointed out, however, that the goals of the organization as explained by Dieye—opposing the practice known as "female genital mutiliation" (FGM) and the

general "submission of women"—are at least partially aligned with the publicly stated policies of the Senegalese government, which has "outlawed female mutilation and has even prosecuted some people that did that to their daughters." Dieye contended that the government's official policies do not reflect its actions accurately.

Two incidents formed the bulk of Dieye's case for a fear of future persecution. First, she claimed that a band of masked men attacked her women's group during one of their clandestine meetings in Dakar, Sengal, in 2001. Armed with sticks, batons, and possibly other weapons, the men beat the women after they refused to end their meeting. During the melee, Dieye suffered a leg injury for which she sought medical treatment. The group called the police, who showed up several hours later and took down the information, although Dieye maintained that the police did not actually intend to pursue the attackers.

Second, Dieye recounted another attack by a similar collection of masked men several months later, though this time the attackers were led by the unmasked and angry husband of a Movement member. This group charged in with knives and sticks, injuring several group members, including Dieye, who apparently suffered four broken teeth, a lip wound, and a shoulder wound. The details of the shoulder wound remain unclear; though she claimed that the men poured hot sand on her shoulder and cut it with a knife, the physician who attended to her injuries after the attack made no mention of this injury in his report. The group again called the police who arrived, apparently tardily, and took down information about the incident. Dieye asserts that the attacks were motivated

by the men's traditional Muslim values and their opposition to the viewpoint and political goals of the Movement.

Dieye marshaled several other factual details in support of her application. For example, she claimed to have received threatening letters and phone calls at home and at her job at the post office. She produced neither copies of the threatening letters nor documentation from the post office about the threats. She also produced several letters, including a letter addressed to her, purportedly written by a Senegalese police officer, discussing the activities of the Movement. Dieye apparently offered the letter to illustrate the illegal nature of her organization, but the letter speaks favorably of the Movement. The IJ found the letter to be either "fraudulent or issued for nongovernmental purposes," observing that "[i]t is inconceivable that a police officer wrote this letter as anything other than accommodation for respondent."

Dieye's brother, a permanent U.S. resident, also testified, albeit in relatively vague terms, about Dieye's political activities. He confirmed that "she was a vice president, president, something like that" of the Movement, and that he had witnessed an attack on a Movement meeting sometime between 1994 and 1996. He corroborated her claimed leg injury, explaining that the injury was a "visible one." Her brother was either equivocal or uncertain about Dieye's broken teeth: he failed to mention the injury at first, and only after several prompts by the IJ did he recall that something was wrong with her teeth, but he did not know "exactly what it was all about." Dieye's brother seemed unaware of the alleged second attack, which struck the IJ as unusual given "the fact that he

seems to have been in communication with her during this period, or at least communication with the family," and given that "[s]he lived with him for a period of time after arriving in the United States." As the IJ observed, "One would think at some point they would sit down around the family dinner table and discuss these horrifying events of her life, but apparently that did not happen."

At the close of evidence, the IJ denied her application. The vagueness of her testimony, discrepancies between her testimony before him and her statements to the asylum officer, and the low probative value of the documents and additional evidence proffered led him to conclude that Dieye was not credible. Because she was not credible, the IJ explained, she had not carried her burden of proof to show a well-founded fear of future persecution, and, consequently, her application for withholding of removal failed as well. The IJ also concluded that "her asylum application is clearly not timely and she must be denied on that basis also," and that the difficulties she experienced with the asylum consultants did not suffice to deem her application as timely filed. As to her CAT claim, the IJ explained that "[t]here is no objective reason to believe that she would be tortured; she was not tortured in the past, and even if she were to be attacked by these nongovernmental groups that would not constitute a valid claim under the [CAT], which must be torture at the hands of the government or a group that the government permits to operate." Accordingly, the IJ denied her application for CAT relief as well. The BIA adopted and affirmed the IJ's decision. Dieye now appeals.

II

When the BIA adopts the IJ's reasoning and supplements the IJ's opinion, that opinion, as supplemented by the BIA, becomes the vehicle for review. *See Singh v. Ashcroft*, 398 F.3d 396, 400-01 (6th Cir. 2005). This court reviews any legal conclusions de novo and factual findings and credibility determinations for substantial evidence. *Tapucu v. Gonzales*, 399 F.3d 736, 738 (6th Cir. 2005); *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). Under the substantial evidence standard, we must uphold the BIA's decision if it is supported by "'reasonable, substantial, and probative evidence on the record considered as a whole.'" *Koliada v. INS*, 259 F.3d 482, 486 (6th Cir. 2001) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). To reverse the BIA's decision, we must find that the evidence not only supports a contrary conclusion, but compels it. *Klawitter v. INS*, 970 F.2d 149, 151-52 (6th Cir. 1992) (citing *Elias-Zacarias*, 502 U.S. at 481).

Over Dieye's objection, Dieye's counsel appropriately limits Dieye's appeal to challenging the IJ's adverse credibility determination, his concomitant rejection of her withholding-of-removal application, and his denial of relief under the CAT. Because the IJ rejected Dieye's asylum application as untimely, we lack jurisdiction to review that rejection as 8 U.S.C. § 1158(a)(3) bars judicial review of "any determination of the Attorney General" regarding the timeliness of an asylum application. *Castellano-Chacon v. INS*, 341 F.3d 533, 544 (6th Cir. 2003).

An applicant qualifies for withholding of removal to a particular country "if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8

U.S.C. § 1231(b)(3)(A). Withholding of removal requires an applicant to demonstrate by a "clear probability"—meaning that it is "more likely than not," 8 C.F.R. § 1208.16(b)—that she will suffer future persecution because of her inclusion in one of the § 1231(b)(3)(A) categories. *INS v. Stevic*, 467 U.S. 407, 412 (1984). To obtain relief under the CAT, an applicant must show "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). An applicant cannot meet her burden of proof for either form of relief, however, if her testimony is not credible. *See, e.g., Hassan v. Gonzales*, 403 F.3d 429, 435-35 (6th Cir. 2005).

After careful consideration of the testimony and other evidence submitted by Dieye, the IJ "reluctantly fo[und] her testimony not to be credible." The IJ correctly summed up Dieye's application in explaining that "there is a great deal of corroborating evidence in this case, but it is of very low probative value, and in some cases actually detracts from the credibility of the case." Morever, the IJ observed that Dieye's

> testimony, while it was enthusiastic, was lacking in detail, and she was often evasive as to details. Her testimony in particular regarding the two attacks on the clandestine meetings was not the sort of testimony that one would expect from a person who was viciously attacked in such a manner. Rather, it was if she were just relating a story.

We accord these findings considerable deference. *See Klawitter*, 970 F.2d at 151-52 ("Substantial evidence is thus a deferential standard which plainly does not entitle a reviewing court to reverse . . . simply because it is convinced that it would have decided the case differently."

(internal quotations omitted)). Dieye's brief attempts to ameliorate the vagueness in Dieye's and her brother's accounts through selective quotation and a somewhat generous reading of the testimony, but our review leads us to conclude that the IJ's impressions were well-founded. At a minimum, Dieye's arguments by no means *compel* the conclusion that the IJ erred. *Elias-Zacarias*, 502 U.S. at 481.

Dieye also goes to some length to explain the paucity of detail in her asylum application as compared with her live testimony. This argument is misplaced. Although the IJ noted "huge differences" between Dieye's asylum application and her hearing testimony, he did not give much, if any, weight to these discrepancies, noting that "these applications are often prepared by people little better than crooks who do not even try to do a good job."

The IJ did rely on the "more significant" discrepancies between her statements to the asylum officer and her testimony. For example, the IJ noted that, while she discussed one attack with the asylum officer, her testimony (as discussed above), related two attacks. She told the asylum officer that "she had been threatened by the government," but, despite some vague complaints about the inefficacy of complaining to the police, did not maintain this assertion during her testimony. She attempts to explain these inconsistencies by alleging that she suffered from poor translation services during her interview with the asylum officer, but she failed to mention any translator difficulties to the IJ, and the asylum officer's notes give no indication of any problems. Rather, the vague nature of her responses to the asylum officer's questions accords well with the character—though not, in

all instances, the substance—of her testimony before the IJ. Moreover, as she selected the translator present at her interview with the asylum officer, her late-stage complaints about his apparent lack of skill are ill-taken. Also unavailing are her complaints that the asylum officer did not ask her enough questions—nothing about the asylum officer's interview suggests a cursory or hasty job, and, as the asylum seeker, Dieye bore the burden to explain why she deserved relief.

As the IJ observed, some of Dieye's documentary evidence damages her credibility significantly. Dieye attempts to disturb the IJ's conclusion that the police officer's letter both condemning and glorifying the Movement was either a fake or produced at her request by explaining that she never testified that it was "prepared in the ordinary course of business" or that it was anything other than a letter "prepared at her request." This too misses the point. The letter, allegedly written by an official working for a government which "banned" Dieye's group, notes that "religious and traditional authorities have demanded the organization be simply banned," but also explains that "[t]his association promotes an amelioration of women conditions; they are fighting against Female Gender Mutiliation . . . against women submission, and for the emancipation of the African Woman." Because the letter was allegedly prepared before Dieye moved from St. Louis, Senegal, to Dakar, it concludes that "the women mentioned above has left Saint-Louis in 1999 for Dakar where she intent to further her battle." As the IJ aptly explained,

> If the police oppose this organization, they certainly would not describe it in glowing terms and they certainly would not word it the way they worded it. They also would not mention that St. Louis was in Senegal, because they would all know that St. Louis was in Senegal.

The letter is damaging to Dieye at every turn. If Dieye's purpose in submitting the letter is to illustrate the government's disapproval of her organization, its tone and the officer's willingness to write it or at least sign it certainly belie that purpose. If the letter is merely an "accommodation" to her, then its probative value is nonexistent, as one can only assume that she drafted the letter herself and thus had the freedom to make the police appear to espouse whatever view of her organization she chose. We are left with the impression either that Dieye fabricated this evidence to some degree or that the government is not particularly interested in stamping out her cause, which discredits her other testimony.

III

Given the character of Dieye's evidence and testimony, and the additional discrepancies noted by the IJ in his opinion, we conclude that the IJ's conclusions were supported by substantial evidence, and thus the IJ did not err in denying Dieye's application for withholding of removal. The IJ's adverse credibility determination is also fatal to her application for CAT relief. *See Hassan*, 403 F.3d at 435. We deny the petition for review.