NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0227n.06
Filed: May 2, 2008

No. 07-3228

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| INACIA PAUL, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON PETITION FOR REVIEW FROM |
| | ) | AN ORDER OF THE BOARD OF |
| MICHAEL MUKASEY, | ) | IMMIGRATION APPEALS |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | |

Before:  MARTIN, GIBBONS, GRIFFIN, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.**  Petitioner Inacia Paul seeks review of the Board of Immigration Appeals ("BIA") order of removal.  Paul argues that the BIA erred by: (1) adopting and affirming the Immigration Judge's finding that Paul was not credible; (2) denying Paul's applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"); and (3) denying Paul due process of law.  For the following reasons, we deny Paul's petition.

**I.**

Paul is a native and citizen of Haiti.  The central facts in this case—many of which are disputed—involve Paul's assertion that prior to entering the United States, she was raped in Haiti for political reasons.  Because of this alleged rape, Paul claims that she fears persecution and torture should she return to Haiti.

Shortly after entering the United States, Paul filed an application for asylum and withholding of removal on September 8, 2004. Her application stated that she was seeking asylum based on her political opinion. But in response to questions 3.A. and 3.B. of the application, Paul indicated that she had not been associated with any political organizations in Haiti.

In an attachment to her application, Paul provided that as a high school student, she had supported President Aristide and was attacked several times during the last few days of his presidency. She also noted that "things got worse" after Aristide departed and that she had to hide to avoid being raped and killed, "for that was how [those opposing Aristide's Lavalas party ("the opposition")] were treating [L]avalas supporters." Paul further provided that on July 18, 2004, she came out of hiding to attend church. On her way back, opposition supporters circled her and her cousin, and inquired about condoms. Paul stated that "we started to cry and I ran away from them and ended up into the house of some people I didn't even know, so they called my parents to come rescue me. But, they raped my cousin and said that they will do worse to me."

On November 23, 2004, Paul met with an asylum officer to review and amend her asylum application. The asylum officer made notations on Paul's original application and typed up her notes summarizing the interview. The asylum officer placed check marks next to answers that were consistent with Paul's original written application. Check marks appear next to questions 3.A. and 3.B., again indicating that Paul had not participated in any political organizations.

The asylum officer also indicated inconsistencies with Paul's original written application. With regard to the incident following church, the notes provide that: "Her cousin ran and got into a house asking for help and the people came and nothing happened to her." The asylum officer

therefore bracketed the portion of Paul's original attached declaration indicating that her cousin had been raped, drew a line through the entire declaration, and wrote "contradicts oral testimony."

In the oral interview, Paul also described a previous incident apparently occurring on November 23, 2003 in which, while en route from her school to her home, Paul was approached by four men who told her to stay home and hit her. Finally, in the oral interview, Paul indicated that she had left Haiti, and did not wish to return there, because of her "political problems" with the opposition, which "was killing people."

Paul explained to the asylum officer that her original written application conflicted with her account during the oral interview because her application was filled out by another person and because she did "not speak or read English."

At Paul's removal proceedings before the Immigration Judge ("IJ"), Paul testified that she was a member and secretary of a pro-Lavalas student group supporting Aristide. She further testified that she formally joined Lavalas in March 2003 and submitted a Lavalas membership card and letter documenting her membership. Paul again described an incident in which a group of young opposition men confronted her on her way home from school and told her to stay home because school was closed, evidently as a result of Aristide's departure.

Paul also described the July 18, 2004 event in which she walked home from church with her cousin. Paul again noted that she and her cousin were surrounded by a group of men who asked for condoms. But Paul testified that after her cousin escaped, Paul herself was raped by two men who told her that they wanted to humiliate her so that she would not support Aristide.

On cross-examination, regarding the inconsistencies in her story, Paul explained that she had told officials in the asylum office that she was a Lavalas member and that she herself had been raped, but that her form had been incorrectly filled out. Her counsel also argued that her testimony was not inconsistent with the asylum officer's notation that "nothing happened to *her*"—which only indicated that Paul's cousin had not been raped.

Paul's sister and brother-in-law testified on Paul's behalf. Paul's sister, Mary Beausejour, indicated that she had been told by her brother that Paul had been raped, but suggested that this incident had occurred when Paul returned home from school (as opposed to church).[1] Paul's brother-in-law, Dominique Beausejour, testified that he was a secret assistant secretary of an organization associated with Lavalas, that he had heard from his brother-in-law that Paul had been raped, and that he had told the brother-in-law not to go to the hospital or report the rape because Paul might be killed. He also suggested that the rapes were politically motivated because Paul's political activities were well known.

The IJ found that Paul was not credible and denied her applications for asylum, withholding of removal, and CAT relief.

---

[1] Paul's sister testified as follows:

Q: What bad thing did they do with her?
A: Things between men and women.
Q: What things between men and women?
A: When – when the men hold the women and then do bad – something bad – something really bad with her.
Q: All right. And that happened when she was leaving school?
A: Yes. When she came from school.

4

Regarding Paul's credibility, the IJ found that Paul's story "has varied massively from her original asylum application to her interview before the Asylum Officer, to her testimony in Court." Noting the thoroughness of the asylum officer's notes, the IJ concluded that Paul had told the officer that she did not belong to a political organization and that it "is fairly clear that [Paul gave] false testimony." The IJ also explained that while the Lavalas identification card and letter may have been authentic, they might also have been procured through her brother-in-law's Lavalas connections.

With respect to the rape allegation, the IJ described the differences between Paul's original written asylum application (providing that *her cousin* was raped), her oral interview (suggesting *no rape* had occurred), and her testimony before the IJ (in which she first asserted that *she* had been raped). The IJ also rejected Paul's counsel's interpretation of the interview notes as "infring[ing] on preposterous" and found that "there's no question that the Asylum Officer found, based on [Paul's testimony] that she had not been raped, and in fact, nobody was raped as a result of that incident." The IJ further noted that Paul's answers were often evasive; that her description of the rape was "amazingly lacking in emphasis and emotion[;]" that Paul's sister conflated the two incidents that Paul had described; and that while Paul's sister described the alleged rape of Paul, both sisters were "smiling rather inappropriately like they were making up a story, and they thought it was sort of humorous."

Finding Paul "completely utterly lacking in credibility," the IJ explained that "[a]lthough parts of her story could be true," it would not speculate as to "which parts they are." It also noted that while the incident involving men inquiring about condoms had been consistently portrayed,

5

"there's no reason to believe that it had any political connection," and "[t]here isn't any reason to believe that [Paul] was active in Lavalas."

While recognizing the general dangers in Haiti associated with a "lawless society," the IJ explained that "none of that implicates any of the factors for which asylum and withholding of removal can be granted." Accordingly, the IJ denied Paul's applications for asylum, withholding of removal, and CAT relief and ordered her removal.

The BIA adopted and affirmed the IJ's decision. It specifically concluded that the IJ's credibility determination was not clearly erroneous, noting, *inter alia*, that Paul's allegations of rape were inconsistent, and that her original application and the oral interview notes suggested that she was not a member of Lavalas.

## II.

Although we review the decision of the BIA, *Anssari-Gharachedaghy v. INS*, 246 F.3d 512, 513 (6th Cir. 2000), "[w]here the BIA adopts the IJ's reasoning, the court reviews the IJ's decision directly to determine whether the decision of the BIA should be upheld on appeal," *Gilaj v. Gonzales*, 408 F.3d 275, 282-83 (6th Cir. 2005). Here, although the BIA provided additional comments explaining its conclusion that the IJ's credibility determination was not clearly erroneous, it also expressly adopted the IJ's decision. "We therefore directly review the decision of the IJ while considering the additional comment[s] made by the BIA." *Id.* at 283.

We review the BIA's legal conclusions *de novo*, but defer to "the BIA's reasonable interpretations of the INA." *Patel v. Gonzales*, 432 F.3d 685, 692 (6th Cir. 2005). The IJ's (and where applicable, the BIA's) findings of fact are "conclusive unless any reasonable adjudicator

would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Thus, the IJ's determination should be upheld unless evidence "not only supports a contrary conclusion, but indeed *compels* it." *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003) (internal citation omitted). This standard equates with the substantial evidence test. *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004).

Facts relevant to credibility determinations, denial of asylum applications, withholding of removal, and CAT are all reviewed under this same standard. *Sylla v. INS,* 388 F.3d 924, 925 (6th Cir. 2004) (credibility determinations are findings of fact reviewed under the substantial evidence standard); *Ouda*, 324 F.3d at 451(applying § 1252(b)(4)(B) standard of review to decision denying asylum); *Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006) (applying § 1252(b)(4)(B) to decision on request for withholding of removal and request for CAT relief).

## III.

Paul first contends that the BIA erred in affirming and adopting the IJ's credibility determination. As discussed more fully below, this adverse credibility determination effectively caused the IJ to deny Paul's applications for asylum and withholding of removal.

An adverse credibility determination must be (1) "supported by specific reasons," and (2) "based on issues that go to the heart of the claim." *Sylla*, 388 F.3d at 926 (internal citations omitted). A discrepancy may bear on the heart of the claim if it appears to be an "attempt[] by the applicant to enhance his claim of persecution." *Id.*; *see also Bah v. Gonzales*, 462 F.3d 637, 641-42 (6th Cir. 2006) (upholding adverse credibility determinations where the discrepancies involved the alien's alleged involvement in a political organization and treatment by the government of Guinea).

7

In this case, both the IJ and BIA provided specific reasons for their conclusions that Paul was not credible. First, both the IJ and BIA identified the inconsistencies between Paul's original asylum application, the oral interview notes, and Paul's in-court testimony regarding the alleged rape. Second, the IJ and BIA noted that Paul's in-court testimony regarding her membership in a political organization was inconsistent with both her original application and the oral interview notes. In addition, the IJ noted that Paul's evasive answers, "amazingly" emotionless description of the rape, and her inappropriate smiling all suggested that Paul was not credible. Given that the IJ was in a unique position to observe Paul's demeanor, these additional observations are entitled to substantial deference. *See Toe v. Gonzales*, 212 F. App'x 467, 471 (6th Cir. 2007) (citing *Paramasamy v. Ashcroft*, 295 F.3d 1047, 1050 (9th Cir. 2002)).

As discussed more fully below, the substance of these discrepancies also goes to the heart of Paul's claims. Paul's political activity and whether any such activity caused her to be persecuted are central elements of her asylum, withholding of removal, and CAT claims.

Paul is correct that her sister's testimony, her identification card, and the Lavalas letter support the conclusion that she was a Lavalas member. But given Paul's initial two failures to mention her Lavalas membership this evidence hardly *compels* a conclusion that she belonged to Lavalas or that she was credible overall.

Paul also notes the IJ's acknowledgment that "the tale about the five men asking for condoms," was consistent, and she suggests that the IJ in fact found that Paul was raped. But, as the BIA found, the IJ only noted that the story about men inquiring about condoms had been consistent; the IJ did not find that Paul had been raped. To be sure, the IJ also did not make an explicit finding

that Paul had *not* been raped. Instead, the IJ explained that the Asylum Officer found, based on respondent's testimony, that Paul had not been raped. Overall, it appears that the IJ found that: Paul had not been a member of a political organization; it was doubtful whether she had been raped;[2] and, in any event, because she was not a member of a political organization, she was not raped for political reasons. Given the overall discrepancies in Paul's story, the evidence does not compel a conclusion contrary to any of these findings or that Paul was credible overall.

Paul also strains to argue with the IJ's interpretation of the asylum officer's notation: "Her cousin ran and got into a house asking for help and the people came and nothing happened to her." The IJ concluded that this notation indicated that the asylum officer was under the impression that nobody was raped during the incident. Paul suggests that these notes only indicated that Paul's *cousin* was not raped but does not speak to whether *Paul* was raped. Paul is correct that the "her" could refer to Paul's cousin as a matter of grammar. But as a matter of common sense, if Paul was trying to assert that *she had been raped*, presumably the asylum officer's notes would have included some reference to this very relevant assertion. Yet neither the original asylum application nor the asylum officer's notes provide any indication that Paul was raped. Moreover, whether we accept the IJ's interpretation of the note (no one was raped) or Paul's interpretation (Paul's cousin was not raped), both interpretations are inconsistent with the information Paul previously provided—that her cousin *was* raped.

---

[2] The IJ also noted that, in contrast to Paul, the asylum officer had "no incentive whatsoever to lie." Although this does not amount to a finding that Paul was not raped, it provides further indication that the IJ seriously doubted that she had been raped.

Finally, Paul argues that cultural norms, post-traumatic stress, language barriers, and the adversarial nature of the hearings before a male IJ, translator, and counsel explain her demeanor before the IJ. Even if we accept this explanation, these factors do not explain Paul's failure to mention her alleged rape to the female asylum officer during their non-adversarial meeting. In any event, none of these potential explanations *compel* the conclusion that Paul was telling the truth.

Overall, because the evidence does not compel the conclusion that Paul was credible and substantial evidence suggests that she was not credible, the BIA did not err in affirming the adverse credibility determination.

## IV.

Paul next argues that the BIA erred by affirming the IJ's denial of Paul's applications for asylum, withholding of removal, and CAT relief.

## A.

We first address the denial of Paul's applications for asylum and withholding of removal. "The IJ, acting for the Attorney General, has discretion to grant asylum to any alien who qualifies as a 'refugee.'" *Yu*, 364 F.3d at 702 (citing 8 U.S.C. § 1158(a), (b)). A "refugee" is defined by 8 U.S.C. § 1101(a)(42)(A) as any alien unwilling to return to her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Thus, an IJ's asylum determination "involves a two-step inquiry: (1) whether the applicant qualifies as a 'refugee' as defined in § 1101(a)(42)(A), and (2) whether the applicant merits a favorable exercise of discretion by the [IJ]." *Yu*, 364 F.3d at 702 (quoting *Ouda*, 324 F.3d at 451). The applicant bears the burden of

demonstrating she is a refugee, which she can establish—without corroboration—through her own credible testimony. 8 C.F.R. § 208.13. While an applicant could theoretically establish this burden of proof through corroboration as opposed to her own credible testimony, an adverse credibility determination is generally fatal to an application for asylum, withholding of removal, or CAT relief. *See Hassan v. Gonzales*, 403 F.3d 429, 435 (6th Cir. 2005); *see also Dieye v. Gonzales*, 242 F. App'x 282, 287 (6th Cir. June 12, 2007).

An alien is entitled to withholding of removal if her "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). To show this, an applicant "must demonstrate that there is a clear probability that he would be subject to persecution" upon return to his home country. *Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998). The applicant bears the burden of proving this, which she may establish – without corroboration – through her credible testimony. 8 C.F.R. § 1208.16(b). Because this burden is higher than the burden required to demonstrate asylum eligibility, "an alien who fails to qualify for asylum necessarily does not qualify for withholding of removal." *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005) (citing *Pilica v. Ashcroft*, 388 F.3d 941, 955 (6th Cir. 2004)).

Here, the IJ found that Paul did not meet either burden because whatever fears Paul had of returning to Haiti did not "implicate[] any of the factors for which asylum and withholding of removal can be granted." Based upon its adverse credibility finding, the IJ doubted whether Paul

11

had been persecuted (by being raped), and found that even if she was raped, "there's no reason to believe it had any political connection."

Paul has not shown that the evidence compelled the conclusion that she met her burden of showing that any fear of persecution was "on account of race, religion, nationality, membership in a particular social group, or political opinion," pursuant to 8 U.S.C. § 1101(a)(42)(A). Given that Paul was found to be incredible, her own testimony did not establish that she had been persecuted for political reasons or had a well-founded fear of any such persecution. As discussed above, although Paul offered some evidence to support her assertion that she was a Lavalas member and testimony corroborating her allegation of rape, the evidence does not compel a conclusion that she was raped for political reasons. Yet substantial evidence, including Paul's original application and the asylum officer's notes, support the IJ's determination that Paul did not belong to a political organization. Substantial evidence, including the original application and the asylum officer's notes (neither of which mention Paul's rape), also supports the conclusion that Paul was not persecuted. Because Paul was unable to meet her burden of establishing her eligibility for asylum, she necessarily does not qualify for withholding of removal.

**B.**

Next we address Paul's CAT claim. An applicant seeking relief under the CAT has the burden of proving that it is more likely than not that she will be tortured if removed to the proposed country. 8 C.F.R. § 208.16(c)(2); *Berri v. Gonzales*, 468 F.3d 390, 397-98 (6th Cir. 2006). "Torture" is defined in relevant part as:

any act by which severe pain or suffering . . . is intentionally inflicted on a person for such purposes as . . . intimidating or coercing him or her . . . for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 1208.18 (a)(1). In turn "'acquiescence' requires that the public official have awareness of such activity and thereafter breach his legal responsibility to intervene to prevent such activity." *Ali v. Reno*, 237 F.3d 591, 597 (6th Cir. 2001) (quoting 8 C.F.R. § 208.18(a)(7)). This definition encompasses situations in which a public official has "actual knowledge" or is "willful[ly] blind" to such activities. *Id.*; *see also Amir v. Gonzales,* 467 F.3d 921, 927 (6th Cir. 2006).

Here, the IJ found that "whoever these people that threatened to rape [Paul] were, they were not acting on behalf of the Haitian Government." Paul asserts, however, that the Haitian Government is unable or unwilling to control the group that raped her—evidently suggesting "acquiescence." Putting aside the issue of whether Paul was raped for discriminatory reasons, Paul offered no evidence to suggest that the Haitian government had actual knowledge of these events or willfully avoided such knowledge. Paul has not shown that torture was more likely than not to occur if she returned to Haiti. Therefore the IJ and BIA did not err in denying this application.

**V.**

Finally, Paul alleges that the IJ and BIA denied her due process of law by refusing to continue the hearing to obtain clarification from the asylum officer as to the meaning of her notes. Again, the asylum officer's notes provide: "[Paul's] cousin ran and got into a house asking for help and the people came and nothing happened to her." The IJ determined that this notation conflicted with

13

Paul's original declaration that "they raped my cousin." Paul contends that there is no conflict because the asylum officer's notation only indicates that *Paul's cousin* was not raped—not that *Paul* was not raped. Paul argues that the IJ's failure to seek clarification from the asylum officer violated her right to due process.

Because Paul did not make any meaningful due process argument before the BIA, however, this claim was not preserved for our review. Title 8 U.S.C. § 1252(d)(1) prevents this court from reviewing issues not raised before the BIA. *Ramani v. Ashcroft*, 378 F.3d 554, 559-60 (6th Cir. 2004). The § 1252(d)(1) exhaustion requirement ensures that the BIA has had ample opportunity to consider a petitioner's claims, its processes are not interfered with prematurely, and that it can compile a record for review. *Id.* at 559. Although due process challenges generally do not require exhaustion, "[an] alien must raise correctable procedural errors to the BIA." *Sterkaj v. Gonzales*, 439 F.3d 273, 279 (6th Cir. 2006) (requiring exhaustion where due process claim was based on BIA's review of inaccurate and incomplete record which the BIA could have cured). Exhaustion is not achieved by vague allusions and undeveloped arguments before the BIA. *Id.* (alien failed to exhaust argument that the IJ misused certain evidence where he only alluded to the unreliability of the evidence in the context of his claim that the IJ was biased).

Paul contends that she raised her due process argument before the BIA. But Paul's brief to the BIA only argued that the IJ erred in: (1) its credibility determination; (2) denying her requests for asylum and withholding of removal; and (3) denying her CAT relief. Paul's single statement within her credibility argument that the IJ "could have continued the Hearing to clarify [the asylum officer's notes]," and observation from our case law that "[a]sylum applicants are entitled to the due

process of law[,]"[3] did not meaningfully raise a due process issue for BIA review. *Ramani*, 378 F.3d at 559. Accordingly, this issue was not preserved.[4]

In any event, Paul's argument is essentially that the IJ abused its discretion in refusing to continue the matter. *See Abu-Khaliel v. Gonzales*, 436 F.3d 627, 634 (6th Cir. 2006) (noting abuse of discretion standard for IJ's denial of a continuance). To the extent that Paul preserved this claim through the same single statement in her credibility argument, the IJ did not abuse its discretion in refusing to continue the matter. The IJ explained that:

> If I thought there was the slightest bit of doubt as to what the Asylum Officer found in this case, I would continue the case and arrange to have her testify . . . to clarify the matter, but I do not believe there is any need for clarification. It's very clear that [Paul] receded from her claim that anyone was raped.

As the IJ noted, the asylum officer was very thorough overall. Thus, had Paul provided any indication at the oral interview that she had been raped, presumably the asylum officer's notes would have included some notation to indicate this. Given the absence of any such notation, Paul's failure to mention any such rape in her original application, and the other inconsistencies in Paul's story, we conclude that the IJ did not abuse its discretion by not seeking clarification.

---

[3] The quotation was from *Alexandrov v. Gonzales*, 442 F.3d 395, 405 (6th Cir. 2006), in which the court observed that "excessive deference to the government or a shallow evaluation of the evidence by the immigration court would be unwarranted." Neither of these factors are present here.

[4] Even if we were to reach this issue, any such due process argument would fail. Paul does not explain how the IJ's failure to grant a continuance amounted to a deprivation of liberty, and this court has summarily rejected similar arguments. *See Abu-Khaliel,* 436 F.3d at 634-35 (rejecting argument that IJ's denial of continuance amounted to due process violation); *Huicochea-Gomez v. INS*, 237 F.3d 696, 700 (6th Cir. 2001) ("The failure to be granted discretionary relief does not amount to a deprivation of a liberty interest.")).

**VI.**

For the foregoing reasons, we deny Paul's petition for review.