NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0532n.06
Filed: August 28, 2008

No. 07-3452

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| | ) | |
| JAN AVEDIS GULEZIAN, et al. | ) | |
| | ) | |
| Petitioners-Appellants, | ) | |
| | ) | **ON PETITION FOR REVIEW OF AN** |
| v. | ) | **ORDER OF THE BOARD OF** |
| | ) | **IMMIGRATION APPEALS** |
| MICHAEL B. MUKASEY, | ) | |
| Attorney General of the United States | ) | |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |

Before: KENNEDY, GILMAN, and GIBBONS, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge**. Petitioners-appellants Jan Avedis Gulezian ("Jan"), Siham Fathi Armanyous ("Siham"), and Avedis Jan Gulezian ("Avedis") seek review of a decision by the Board of Immigration Appeals ("BIA"). Petitioners argue that the BIA erred by: (1) adopting and affirming the immigration judge's finding that Jan and Siham were not credible; and (2) affirming the denial of withholding of removal, concluding that there was no past persecution and that petitioners failed to show it was more likely than not that they would be subject to future persecution if they returned to Egypt.

For the reasons set forth below, we deny the petition for review.

I.

Petitioners are natives and citizens of Egypt. On June 25, 2002, Jan was admitted to the United States as a non-immigrant visitor with authorization to remain in the United States until December 24, 2002. Siham, Jan's wife, and Avedis, Jan's son, were admitted on August 7, 2003, with authorization to remain until February 6, 2004.[1,2] Petitioners did not depart by their departure dates.

## A.

Jan filed an application for asylum on September 29, 2004, in which he also sought asylum on behalf of Siham and Avedis. In his asylum application, Jan stated that he is of Christian-Armenian origin and Siham is of Christian-Coptic origin. He wrote, "My family and I will be persecuted, mistreated for our religious beliefs and for our origin by the Moslem [sic] fundamentalists and the majority of the population. We will be discriminated [against] in almost every way in our daily life, from residence, education, and [the] ability to obtain employment." He listed several types of mistreatment: 1) in 1982, Jan was accused of currency fraud and told the charges would be dropped only if his family vacated their apartment in which they were the only Christian family within 24 hours; 2) his family was forced to move out of an apartment that they owned, in which they were the only Christian residents, due to their neighbors' attempts to convert them to Islam; 3) his son, a "gifted soccer player," got rejected from the national soccer team for being a Christian; 4) his daughter was discriminated against at a public university because she is a

---

[1] The date Siham and Avedis were entitled to remain in the United States until is listed as December 24, 2002 in their Notices to Appear. As this date is before they arrived in the United States, it is likely a typographical error.

[2] Jan and Siham also have a daughter, Catherine Jan Gulezian ("Catherine"). She did not seek asylum as part of the family's application.

Christian and had to transfer to the American University in Cairo to avoid discrimination; 5) his career and business as a jeweler suffered because Muslim jewelry retailers discriminated against Christian designers, and he was attacked and threatened when he attempted to start a union; 6) his work and income suffered due to a decline in tourism following a 1997 terrorist attack in Egypt. Jan elaborated that he was persecuted as both a Christian and as a minority of foreign (Armenian) origin, but, as he contemplated leaving Egypt, his mother became ill and he remained until her death in 2002, when he "immediately" left Egypt. After Jan filed his application, petitioners were interviewed by an asylum officer but their application was not granted. The application was referred to an immigration judge ("IJ").

B.

On April 29, 2005, petitioners appeared at a hearing before the IJ. The IJ heard testimony limited to whether petitioners satisfied the requirement in 8 U.S.C. § 1158(a)(2)(B) that the asylum application must be filed within one year of their arrival in the United States. Petitioners conceded that the application was not filed within one year of Jan's entry into the United States. They argued that they qualified for an exception for extraordinary circumstances pursuant to 8 U.S.C. § 1158(a)(2)(D). The IJ ruled that the one year ban applied and that there were no extraordinary circumstances. Therefore, petitioners could not seek asylum.

On September 1, 2005, petitioners testified at a hearing before the IJ. In a separate criminal prosecution, Jan had been charged with two counts of forgery and possession of criminal tools, a fraudulent green card and a fraudulent social security card. He pled guilty to one count of possession of a criminal tool and was sentenced to probation.

3

Jan testified about the events that led to his guilty plea for possessing criminal tools. He was offered a "legal" social security card for $150.00. When he received the social security card and a green card, he discovered they were fake because he had not submitted paperwork for a green card. He did not use either item until he was stopped for a traffic violation in November 2003, at which point he showed the officer his international driver's license. The officer asked for a social security card or American identification and, in response, Jan produced the fake documentation. Jan said he had the fake social security card and green card in his wallet because he was "negligent."

Jan testified that he and his wife are practicing Christians. He testified that his first problem in Egypt occurred in 1982, at which time he was renting an apartment in Cairo that he had leased from 1978 until 1983. He stated that all of the other building residents were Muslim. A "representative from monitoring security" came to his workplace and accused him of making counterfeit money and having a counterfeit money machine at his residence. He testified that when he suggested the representative come to his residence to confirm that the allegation was false, the representative stated that the landlord, a judge in Cairo, wanted Jan to move out. The representative told Jan that unless he moved out, counterfeiting charges would be brought against him. As a result, Jan moved out within 24 hours.

He testified that he experienced professional difficulties on account of his religion. These problems worsened in 1997 when he, a jewelry designer who sold to retailers, returned from a seminar in Chicago. He said that a recession began in Egypt after the 1997 terrorist attacks, and a lot of jewelry designers lost business. He added that many jewelry retailers refused to stock jewelry designed by Christians. Although he nearly went bankrupt, his business survived on small orders and on his savings.

Jan testified that his family was threatened during the 1990s, and he was threatened in a professional capacity after he returned from Chicago in 1998. He stated that "some Muslims that I know" made threatening telephone calls. The callers asserted that Jan's wife and daughter must convert to Islam, or they would be in danger.

Jan testified that in 1998 his daughter was crossing the street in front of their apartment and was hit by a car. The car fled the scene of the accident and was not identified. His daughter was in the hospital for more than 15 days and received medical treatment for another two months. A police report was filed, but the driver of the car was never identified. Jan believes his daughter was hit by the car because she was Christian. His rationale is that the accident occurred at the same time as the threatening telephone calls.

Jan decided to leave Egypt in 1999, but as he was packing his luggage and had his ticket ready, his mother became ill and was taken to the hospital. His mother remained in the hospital for 45 days, and Jan cancelled his travel plans. She made him promise not to leave Egypt until she died, which was in 2002.

In December 1999, Jan left Egypt for Australia in order to sell jewelry. He stated that his trip to Australia was temporary and that he traveled there after his mother was released from the hospital. He never intended to remain in Australia. Jan admitted that his visa for entry into Australia indicated that he was a visitor without permission to work.

Jan testified that two police officers came to his workplace in 2000, and the police officers told him that a Muslim trader had accused him of stealing materials. He was taken to a police station on a Thursday and was not released until Saturday, when the trader withdrew the accusation.

He also testified that another incident occurred in 2000. He was driving out of a parking lot when two Muslim traders approached and started insulting him. This confrontation led to fighting and to Jan's arrest. The traders were trying to stop him from organizing a group of designers. A group of Muslim designers already existed, and they did not want a jewelry organization to be headed by a Christian. He was hit many times during the fight. Following the altercation, he was taken away in a police car and arrested. The men with whom he fought were also taken away in a police car. The police took him to a police station in another jurisdiction in Cairo. Although he had given his identification to a police officer who never returned it to him, he was kept for three days in a small room with bad conditions since he did not have identification. The police officers handcuffed him and took him to various police stations and courts to see if he had a criminal record. When the police discovered nothing to charge Jan with, he was released. He has mental problems as a result of the arrest and incarceration. As a result of the dirt in jail, he has a skin disease.

Siham testified that she waited until 2003 to come to the United States to join Jan so that her son, Avedis, could finish his last year in school. She said she is a Coptic Christian. She explained that she had problems with the neighbors in Egypt, as they were trying to convert her to Islam. In June and July of 1998, she received threatening telephone calls from a neighbor. The caller threatened to harm her family if she did not convert to Islam.

She added that her daughter was hit by a car in April 1998 in front of the house and was seriously injured. She later clarified that the telephone calls were received in June and July of 1997 – not 1998 – and therefore, before her daughter's accident in April 1998. She explained that the telephone calls continued until her daughter's accident in April 1998. Siham did not call the police

6

about the threatening calls because she did not think they would respond. She never received telephone calls from anyone taking credit for harming her daughter.

Catherine, who testified that she is Christian, was hit by a car crossing the street in front of her residence in Egypt. She could not identify the person who hit her but was hospitalized for 15 to 20 days and received further medical treatment for another two months. She speculated that Muslim neighbors were responsible for the accident because they used to threaten her family. She came to the United States with her mother and brother in 2003, but she went back to Egypt after a vacation to finish paperwork. She returned to the United States in 2004.

C.

On September 1, 2005, the IJ denied petitioners' application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). The IJ stated, "[t]he Court believes that the respondent embellished many of his claims for seeking asylum in the United States and the Court does not find the respondent credible in many respects regarding his testimony." This finding was based, in part, on the conclusion that Jan "was not honest in the way that he downplayed his November 2003 arrest and later conviction in the United States" because he knew the documents were not authentic at the time he received them but had them in his wallet when he was stopped by the police. The IJ concluded that Jan intended to use the fraudulent documents and that the incident "significantly" impacted his credibility.

The IJ further found that Jan's testimony was not believable because of vagueness about both dates and the threats his family received. Jan's asylum application made no mention of "the most significant events that the respondent claims today is [sic] the basis for him seeking asylum in the United States." Most significantly, the application did not mention the incident in which Catherine

7

was hit by a car. The IJ found there was no proof the accident was based on the family's religion. The IJ found "it is not even likely that the family was actually receiving threatening phone calls" at the time of the accident, but even if they were, there was no evidence linking them to the car accident. The IJ added, "[t]he Court believes that the reason the respondent didn't mention [the accident] in his asylum application[,] is he didn't believe, at the time that he filed his asylum application that this incident occurred to his family because they were Coptic Christians." The IJ added that if they really had believed that the accident was on account of their religion, they would have made plans to relocate within Cairo or even to leave Egypt, which they did not do.

The IJ stated that it was "an interesting coincidence" that Jan had his bags packed to leave Egypt at the time his mother became ill and promised he would not leave until her death. Jan, however, went to Australia in December 1999 on a tourist's visa. If he entered Australia to sell jewelry, as he testified, then he lied to Australian authorities when he obtained his visa. Moreover, if he had been in fear of his family's life and safety after the car accident, he would have been expected to stay in Australia and apply for asylum there.

The IJ found that "the entire family's treatment of refugee status is not at all consistent with how a refugee would be fleeing persecution from a country." This included the fact that Siham and Avedis waited to leave Egypt until Avedis finished school. Furthermore, Jan waited until his mother passed away to leave Egypt.

In addition, the IJ found Catherine's actions indicated that she did not believe the accident was a result of her religion. She came to the United States with her mother and brother in 2003 but returned to Egypt when her vacation ended. The IJ explained, "[i]f she really believed that the incident that occurred to her in 1998 was because she was a Coptic Christian, she obviously would

8

not have stayed in Egypt that period of time." The IJ concluded, "[f]or all the reasons stated above, the Court does not believe that the respondent, especially the father and also to some extent, the wife, are credible in this case."

The IJ next considered whether the acts the family suffered in Egypt were past persecution. The IJ concluded that, even if Jan had been found credible, the incidents did not amount to past persecution. In his asylum application, Jan claimed past persecution on the basis of Muslim jewelers not buying his jewelry. While Jan lost customers, he was able to keep his business until he left Egypt and never had to seek other employment. As to the car accident, there was no evidence either that it was intentional or that it occurred because Catherine was Christian. In addition, the two times that Jan was jailed in Egypt after fighting with Muslim traders did not qualify as past persecution. Jan did not need medical treatment after either fight, was in jail for only a few days "until the facts could be sorted out," and was not persecuted by police while he was held. Jan "apparently did not believe that these incidents were related to him being a Coptic Christian because he did not even mention them on his asylum application," but he must have decided the incidents would benefit him during his hearing. Furthermore, Jan does not know what happened to his attackers; they may have been prosecuted.

The IJ found that Jan was a victim of economic hardship. The IJ, however, concluded that the economic hardship was an insufficient basis for asylum. Thus, Jan came to the United States "for economic reasons, generally not because of specific economic persecution that he was suffering at that point."

The IJ considered whether petitioners had shown a well founded fear of future persecution. The IJ noted that the incidents the petitioners complained of occurred long before they came to the

9

United States and noted that Jan was "not credible in regards to many of his claim[s]," especially that he was discriminated against because he was a Christian. The IJ found that petitioners could not show they were more likely than not to be persecuted if returned to Egypt.

D.

Petitioners appealed to the BIA, and the BIA affirmed. The BIA found that the IJ accurately set forth the facts and that the IJ's findings of fact were not clearly erroneous. The BIA stated that Jan arrived in the United States in June 2002 but did not file his asylum application until September 2004, which was untimely. It agreed with the IJ, for the reasons stated by the IJ, that Jan "failed to demonstrate the existence of extraordinary circumstances preventing him from filing for asylum within the statutory and regulatory time limits, or that changed conditions brought him within the statutory exception for the time-barred application." It acknowledged that the IJ expressed concern about "the nature, circumstances, and severity of the harm" petitioners suffered, the cause of the incidents, and petitioners' motives for leaving Egypt. The BIA agreed that petitioners failed to establish that they were more likely than not to be persecuted if they were returned to Egypt. It affirmed for the reasons set forth in the IJ's decision and dismissed the appeal. Petitioners filed a timely petition for review.

II.

A.

"We review de novo the legal determinations made by the IJ or BIA, but review factual findings under the deferential 'substantial evidence' standard." *Zoarab v. Mukasey*, 524 F.3d 777, 780 (6th Cir. 2008) (citing *Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998)); *see also* 8 U.S.C. § 1252(b)(4)(B). Under the substantial evidence standard, "we must uphold the

administrative decision if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole,' and may reverse only if the evidence compels a different result." *Zoarab*, 524 F.3d at 780 (quoting *Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006)). Facts relevant to credibility determinations, denial of asylum applications, and withholding of removal, are all reviewed under this same standard. *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004) (credibility determinations are findings of fact reviewed under the substantial evidence standard); *Ouda v. INS.*, 324 F.3d 445, 451(6th Cir. 2003) (applying the substantial evidence standard to a decision denying asylum); *Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006) (applying the substantial evidence standard to a decision on request for withholding of removal).

"Where the BIA adopts the IJ's reasoning, the court reviews the IJ's decision directly to determine whether the decision of the BIA should be upheld on appeal." *Gilaj v. Gonzales*, 408 F.3d 275, 282-83 (6th Cir. 2005). Here, although the BIA provided additional comments in support of the IJ's decision, it also stated that it based its reasoning on grounds explained by the IJ. "We therefore directly review the decision of the IJ while considering the additional comment[s] made by the BIA." *Gilaj*, 408 F.3d at 283.

B.

Jan asserts that the IJ did not make an explicit credibility finding. He also argues that he testified credibly.

"While an adverse credibility finding is afforded substantial deference, the finding must be supported by specific reasons." *Sylla*, 388 F.3d at 926. "An adverse credibility finding must be based on issues that go to the heart of the applicant's claim. They 'cannot be based on an irrelevant

11

inconsistency.'" *Id.* (quoting *Daneshvar v. Ashcroft*, 355 F.3d 615, 619 n.2 (6th Cir. 2004)).[3] "If discrepancies 'cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility.'" *Id.* (quoting *Daneshvar*, 355 F.3d at 619 n.2); *see also Bah v. Gonzales*, 462 F.3d 637, 641-42 (6th Cir. 2006) (upholding an adverse credibility determination where the discrepancies related to the petitioner's alleged involvement in a political organization and treatment by a foreign government); *Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004) (upholding an adverse credibility determination based upon inconsistencies and statements that were implausible in an asylum application based on fear of religious persecution).

As an initial matter, contrary to petitioners' assertion, the IJ made an adverse credibility finding. The IJ stated,"[f]or all the reasons stated above, the Court does not believe that the respondent, especially the father and also to some extent, the wife, are credible in this case."

The IJ's adverse credibility determination is based on substantial evidence. As the IJ stated, Jan was not forthcoming about his November 2003 arrest and conviction, asserting that he had a false green card and social security card in his wallet because of negligence. He was also vague

---

[3]In *Amir v. Gonzales*, 467 F.3d 921, 925 n.4 (6th Cir. 2006), this court noted that the statute governing credibility determinations has been modified:

> The REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 231 (codified in scattered sections of 8 U.S.C.), changed the standard governing credibility determinations, stating that those determinations may be made "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii). This provision, however, only applies to aliens who applied for asylum, withholding of removal, or other relief on or after May 11, 2005, the effective date of this division of the Act. Pub. L. 109-13, div. B, § 101(h)(2), 119 Stat. 231 at 305.

As petitioners applied for asylum on September 29, 2004, this provision of the REAL ID Act does not apply to their claims.

about the dates of the threatening telephone calls and the content of the threats that were received. Importantly, unlike the testimony at the hearing, the asylum application did not mention Catherine's car accident, nor did it mention Jan's two arrests in Egypt. The IJ noted that the timing of Jan's mother's illness – coming the day he was scheduled to leave Egypt – was "convenient." The IJ concluded that when Jan visited Australia in December 1999, if he had truly been persecuted, he would have requested refugee status there. In addition, Avedis and Siham waited until Avedis finished school to leave Egypt – but if they were persecuted, they would have left Egypt sooner. Furthermore, Jan waited for his mother to pass away before departing Egypt. Moreover, the two times Jan testified that he was jailed in Egypt were not listed on his application for asylum. These issues, identified by the IJ, go to the heart of Jan's claim as they directly relate to his claim of religious persecution and the credibility of his testimony. Given this evidence, the adverse credibility determination was based on substantial evidence.

C.

"The IJ, acting for the Attorney General, has discretion to grant asylum to any alien who qualifies as a 'refugee.'" *Yu*, 364 F.3d at 702 (citing 8 U.S.C. § 1158(a), (b)). Under 8 U.S.C. § 1101(a)(42)(A), a "refugee" is defined as any alien "who is unable or unwilling to return to" his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." An alien has one year from his or her arrival to apply for asylum unless he or she can demonstrate "either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application." 8 U.S.C. § 1158(a)(2)(B), (D).

13

The IJ found that the asylum application was untimely. Petitioners concede that the challenge they brought to this finding before the BIA was not based on either a constitutional question or a question of law. Therefore, they concede that the panel lacks jurisdiction to review it and do not challenge the denial of asylum. *See Amir v. Gonzales*, 467 F3d 921, 924 (6th Cir. 2006) ("We are barred from 'review[ing][ ] asylum applications denied for untimeliness only when the appeal seeks review of discretionary or factual questions, but not when the appeal seeks review of constitutional claims or matters of statutory construction.'" (quoting *Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006))).

## D.

We now turn to petitioners' claim that the IJ erred in denying withholding of removal. "[T]he Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). The applicant must demonstrate past persecution or demonstrate that future persecution is "more likely than not." 8 C.F.R. § 1208.16(b)(1), (2). In order to demonstrate future persecution, an applicant "must demonstrate that there is a clear probability that he [or she] would be subject to persecution" if he or she were to return to his or her home country. *Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998). Discrimination alone "does not rise to the level of persecution." *Id.* at 389. Furthermore, "[p]ersecution is an extreme concept that does not include every sort of treatment our society regards as offensive." *Ali v. Ashcroft*, 366 F.3d 407, 410 (6th Cir. 2004) (citation omitted).

An applicant's credible uncorroborated testimony is sufficient to meet his or her burden. 8 C.F.R. § 1208.16(b). "While an applicant could theoretically establish this burden of proof through

14

corroboration as opposed to her own credible testimony, an adverse credibility determination is generally fatal to an application for asylum, withholding of removal, or CAT relief." *Paul v. Mukasey*, No. 07-3228, 2008 WL 1931442, at *5 (6th Cir. May 2, 2008).

Jan argues that the incidents that occurred, when viewed in the aggregate, rise to the level of past persecution. Given the adverse credibility determination, and taking the record as a whole, the IJ's finding that Jan did not suffer past persecution is supported by substantial evidence. The IJ concluded Jan was a victim of economic hardship that did not rise to the level of persecution. Jan offered no evidence other than testimony found to lack credibility.

Jan argues that substantial evidence does not support the finding that petitioners would not be subject to persecution if returned to Egypt. The IJ noted that the incidents petitioners complained of occurred long before they came to the United States and noted that Jan was "not credible in regards to many of his claim[s]," especially that he was discriminated against because he was a Christian. The IJ concluded that Jan, Siham, and Avedis failed to prove they were more likely than not to be persecuted if they returned to Egypt. Given the adverse credibility finding and lack of additional evidence, substantial evidence supports the IJ's conclusion that petitioners failed to meet their burden of showing it is more likely than not that they will be persecuted if they return to Egypt.

III.

For the foregoing reasons, we deny the petition for review.

15