NOT RECOMMENDED FOR PUBLICATION
File Name: 09a0014n.06
Filed: January 8, 2009

No. 08-3500

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MAMOUDOU DIAKITE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE BOARD OF |
| | ) | IMMIGRATION APPEALS |
| MICHAEL MUKASEY, | ) | |
| | ) | OPINION |
| Respondent. | ) | |
| | ) | |

Before: KENNEDY, COLE, and GILMAN, Circuit Judges.

**RONALD LEE GILMAN, Circuit Judge.** Mamoudou Diakite, a native and citizen of

Guinea, applied for withholding of removal and protection under the Convention Against Torture

(CAT). He claims that the Guinean police beat and tortured him on account of his political

activities. After a hearing, the immigration judge (IJ) assigned to Diakite's case found that he was

not credible and that he had failed to provide sufficient corroboration of his claim. The IJ therefore

denied his application, and the Board of Immigration Appeals (BIA) affirmed. Diakite timely

petitioned for review. For the reasons set forth below, we **DENY** his petition.

## II. BACKGROUND

Diakite illegally entered the United States in December 1999, when he was 30 years old. In

September 2003, the Department of Homeland Security served Diakite with a Notice to Appear,

which alleged that Diakite was an alien present in the United States without being admitted or

paroled, and therefore was removable under 8 U.S.C. § 1182(a)(6)(A)(i). Diakite was ordered to appear before an IJ to explain why he should not be removed to Guinea. He conceded removability and applied for withholding of removal and for protection under the CAT. *See* 8 U.S.C. § 1231(b)(3); 8 C.F.R. §§ 208.16(c) and 208.18.

A.      **Merits hearing**

1.      *Direct examination*

The following factual allegations were elicited from Diakite, primarily on direct examination during the merits hearing. Diakite was born in KanKan, Guinea. A teacher introduced him to a political group known as the Rally for the People of Guinea (RPG), but the record does not indicate the teacher's name or when the introduction took place. In November 1991, when Diakite was 22 years old, he assumed the role of president of the RPG's youth bureau in KanKan. He organized a peaceful march in May 1992 protesting excessive student fees imposed by the government. Soldiers descended on the protestors and a physical confrontation ensued. The soldiers shot and killed Diakite's best friend, Mamadi Mate. Like Diakite, Mate had been an active member of the RPG. Six other people died during the protest.

The day after Guinean soldiers killed Mate, Diakite allegedly traveled to Mate's home with other people to express his condolences to the Mate family. Believing that Diakite and his associates were on their way to another protest, government authorities arrested him and several women, and took them to jail. Diakite was subsequently taken to the Sendoeta Military Camp, where officials beat him, doused him with cold water, and tortured him to elicit the names of key members of the RPG involved in the May 1992 protest. He did not reveal any names. Diakite was released two days

after his detention because the national deputy of the RPG, Aminata Mady, intervened on his behalf. The government released him on the condition that he not engage in further marches against the government or commit any violent acts. They threatened to kill him if he broke the terms of his release.

Diakite claims that he relocated from KanKan to Conakry to study at the University of Conakry in 1997. He resumed his involvement with the RPG, acting as a liaison between students and the party. On October 28, 1999, with the help of his friend Ibrahim Kalil Conde and other members of the RPG, Diakite organized a public demonstration to protest the high cost of transportation. The protestors blocked traffic on a highway to make their point. Soldiers arrived on the scene to break up the blockade, and a confrontation between the soldiers and the protestors led to violence. Three soldiers and four students were killed during the clash. Conde was shot in the leg. The Conakry blockade was purportedly one of many road blockades that took place countrywide on that date.

Men that Diakite referred to as "policemen" allegedly arrested Diakite during the clash. They beat him up, pistol-whipped him, and stomped and kicked his testicles, stomach, and other parts of his body. The officials then placed him in a truck to take him to a neighborhood of Conakry called Amdalaye.

Upon arriving in Amdalaye, Diakite claims that the officials threw him into a dark prison cell and proceeded to beat him, seeking information about the RPG movement. The cell was filled with excrement. As a result of the severe beatings, he lost vision in his left eye. Diakite received no medical assistance while detained in the Amdalaye prison. A doctor in the United States signed a

letter in August 2006 confirming that Diakite is blind in his left eye, concluding that the damage was likely caused by the trauma that Diakite allegedly suffered seven years earlier.

Diakite alleges that he left the prison on November 4, 1999. He claims that he escaped with the help of his cousin, Bakari Diakite, who was a member of the military. His cousin had to physically help Diakite out because he was not able to walk, was very weak, could not see well, and felt ill. Upon his escape, Diakite went into hiding at the home of Sekou Camara, a businessman and active member of the RPG who lived in Conakry. While in hiding, Diakite stayed in periodic contact with his uncle, Amadou Diakite. Authorities arrested Diakite's mother twice in order to find out Diakite's location. Camara purportedly helped Diakite escape to America from Guinea by providing him with a fraudulent passport and by making "arrangements" with airport officials to assure his safe passage. Diakite fears that he will be killed by Guinean authorities if he is returned to Guinea.

### 2. *Cross-examination*

The government's cross-examination focused largely on the lack of documentation to support Diakite's various factual claims. Diakite had no documents establishing that he was in Guinea in 1999. Nor could he produce documents corroborating his enrollment at the University of Conakry. Diakite proffered no evidence showing that the PRG even existed in 1992, that he was a member of the group, or that he was a member of its youth branch. There were no documents supporting his claim that a protest occurred in May 1992 in KanKan. Diakite believed that the May 1992 protests—which led to the deaths of six people—might have garnered international press coverage. But he did not submit any news reports to the immigration court. Diakite noted, however, that the

Guinean press likely did not cover the protests because the government suppresses unflattering information.

He was also questioned regarding his failure to produce corroborating evidence to show that the "massive" Conkary traffic blockade ever took place. Diakite claimed that he did not know what was required to prepare for "this situation," likely referring to the merits hearing, and that he had a problem with "the language," presumably describing his inability to speak English very well. He further stated that he considered going back to Guinea after arriving in the United States, but decided not to in light of the risk that he would be killed there.

The government's counsel pressed Diakite to provide explanations of apparent discrepancies and seemingly implausible events. Diakite was asked why he was permitted to attend the University of Conakry—a public university—after having previously been beaten by government officials for RPG-related activities in KanKan in 1992. He replied that he was not as well known in Conakry as he was in KanKan. Diakite was also asked why he referred to Bakari, the cousin who rescued him from the Amdalaye prison in 1999, as a "police officer" in the application for relief from removal (Form I-589), but testified that Bakari was a member of the military during the merits hearing. In response, Diakite explained that people in Guinea think of police officers and military personnel as basically the same, although he conceded that the officials who run the military are not the same people who run the police force.

**B.  The IJ's oral decision**

*1.  Credibility finding*

The IJ found that Diakite's testimony was not credible. Commenting on Diakite's demeanor and responsiveness, the IJ observed that "the respondent persistently did not answer the questions posed to him," "he appeared more intent on giving a narrative of what he might have memorized," and that he "had trouble telling us exactly how old he is."

Diakite's credibility was also undermined, according to the IJ, by apparent inconsistencies in his story. The original application for relief referred to Diakite's cousin as a police officer even though Diakite testified orally that his cousin was a member of the military. The IJ did not accept Diakite's explanation that Guineans view the police and the military as the basically the same entity. Another apparent inconsistency was that, although Diakite asserted that he would be killed if he returned to Guinea, he stated that he initially considered returning to Guinea due to problems that he was having in the United States.

There was also an apparent omission that the IJ found noteworthy. In his application for withholding, Diakite claimed that he was "denied food and water" during his May 1992 imprisonment. But Diakite did not mention this fact during the merits hearing.

Finally, the IJ found certain aspects of Diakite's story to be implausible. Regarding Diakite's alleged imprisonment and torture at the hands of Guinean authorities in May 1992, the IJ asked, rhetorically, "Why would he be released if he did not give them any information?" This question raised "a red flag with respect to respondent's credibility" in the mind of the IJ. The IJ was also skeptical regarding whether a high-level RPG official would be able to pull strings to have Diakite released from prison in May 1992. And even if this did happen, the IJ reasoned that Diakite's release from prison showed that his imprisonment "was not really a political matter . . . or that [Diakite] was

wanted by the government." Diakite's escape from the Amdalaye prison in 1999 was also "improbable and unbelievable" according to the IJ. He was unwilling to believe that, during the alleged escape, no guards were visible and that the respondent's cousin was able to simply "march in" and get him out. In sum, the IJ's adverse credibility finding was based on Diakite's demeanor, inconsistencies, an omission, and facts that the IJ found to be inherently implausible.

### 2. *Corroborating documents*

Diakite submitted several documents that the IJ found to be insufficient to establish a claim for either withholding of removal or protection under the CAT. He introduced an expired Guinean passport that states his name and contains his picture, which he obtained from a Guinean consulate while in the United States. The IJ found that the expired passport was of no corroborative value. Country Conditions Reports from the Department of State for the years 1992, 1999, and 2005 were also found to be unhelpful to Diakite. Indeed, the IJ drew a negative inference from these reports, finding that if the 1992 and 1999 protests actually took place, then the reports would have mentioned them, since less noteworthy incidents received coverage therein. With respect to the 2005 report, the IJ remarked that it seemed to indicate that the political climate in Guinea had improved. Nor did a letter from Diakite's United States eye doctor impress the IJ; the doctor's only objective finding was that Diakite is blind in his left eye due to optic nerve damage and glaucoma. The doctor's conclusion that trauma likely caused Diakite's blindness was based solely on Diakite's claim that he was severely beaten seven years earlier.

Also discounted was the probative value of an unsigned letter from Amadou Diakite, Diakite's uncle, and a signed letter from Ibrahim Conde, the friend who allegedly participated in the

1999 protest. Amadou's letter was not considered credible because it was both unsigned and typewritten. The IJ further faulted the letter for not mentioning the RPG—even though the letter states that "the police force . . . ask me to explain with whom we negotiated to get you out of prison and how you were able to go overseas." As for Conde's letter, which was signed, the IJ noted that the letter

> does not say anything at all about [the] RPG, does not note that either of one of them [sic] belonged to the RPG, it does not note that they organized the protest, and basically it does not say what this protest was even about. So this document hardly corroborates anything in respondent's story.

Conde's letter mentioned, however, that he had not seen Diakite since the October 28, 1999 protest in Conakry. The transcript of the merits hearing, as well as the letter itself, indicate that the letter contained an enclosure of a photograph depicting Conde with a wounded leg. But the photograph is missing from the record on appeal. In any event, Conde stated in his letter that he learned that Diakite had been arrested and imprisoned, but does not explain how he learned of these facts. The IJ did not find the letter to be helpful to Diakite. Instead, he impugned the letter as "just unaccounted for hearsay and not credible evidence," again highlighting the failure of the letter to mention the RPG and the "discrete details" of the October 28, 1999 protest.

Diakite lacked corroborating documents to prove that the events in his story actually took place, according to the IJ, even though he apparently had the ability to obtain other documents from his home country. Specifically, the IJ found that Diakite "did not corroborate that any of these incidents happened, and he did not corroborate that he was a member of the RPG, even though he got corroborative documents from Guinea."

In sum, the IJ found that Diakite had failed to satisfy his burden of proof for either his request for withholding of removal or relief under the CAT because his claim suffered from the dual infirmities of insufficient corroboration and a lack of testimonial credibility. The IJ therefore denied his claims. Diakite timely appealed to the BIA.

**C.     The BIA's order**

The BIA determined that the IJ's adverse-credibility finding contained no clear error because there were numerous factors supporting the finding, including

> the respondent's lack of responsiveness; the [IJ's] observation that the respondent testified as if he had memorized his claim; his statement that he failed to file his asylum application within one year of his arrival in the United States because he intended to return to Guinea, a country where he claimed to fear persecution; and his failure to corroborate critical aspects of his claim, even though such corroborative evidence was available to him.

But the BIA acknowledged that one of the IJ's findings—that a state-operated university would not likely permit Diakite to attend if he had indeed engaged in protest activities—was speculative. The BIA determined, however, that the IJ did not actually rely on the speculation to inform his adverse credibility finding. Instead, the BIA construed the statement as simply another way to emphasize that Diakite's claim lacked sufficient corroboration.

## II. ANALYSIS

**A.     Standard of review**

"Because the BIA adopted the IJ's decision with additional commentary, we review the decision of the IJ, as supplemented by the BIA, as the final administrative order." *Ceraj v. Mukasey*, 511 F.3d 583, 588 (6th Cir. 2007). Questions of law involving immigration proceedings are

reviewed de novo. *Ali v. Ashcroft*, 366 F.3d 407, 409 (6th Cir. 2004). The IJ's factual findings, on the other hand, including a determination that the petitioner failed to establish eligibility for asylum or withholding of removal, will not be disturbed if substantial evidence supports such determinations. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (holding that a factfinder's rulings will be upheld if "supported by reasonable, substantial, and probative evidence on the record considered as a whole" (citation omitted)). Under this standard, we will not reverse a factual determination of the IJ unless we find "that the evidence not only supports a contrary conclusion, but *compels* it." *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (emphasis in original).

We also note the limited applicability of the REAL ID Act of 2005 (the Act) to this case. *See, e.g.*, Pub. L. No. 109-13, 119 Stat. 302–05 (codified as amended at 8 U.S.C. § 1158(b)(1)(B)(iii) (describing in detail the factors that immigration courts may consider in making credibility determinations)); *see also* REAL ID Act of 2005 § 101(h), Pub. L. No. 109-13, 119 Stat. 305-06 (setting the effective dates of various provisions of the REAL ID Act). Diakite filed his application for withholding of removal and protection under the CAT in 2004. As the government concedes, this means that most provisions of the Act do not apply to him. *See id.* at § 101(h)(2).

But the Act contains a standard of review that is applicable: reviewing courts may not reverse an agency finding with respect to the availability of corroborating evidence unless they are compelled to conclude that such evidence is unavailable. 8 U.S.C. § 1252(b)(4)(D); *see also* REAL ID Act of 2005 § 101(h)(3), Pub. L. No. 109-13, 119 Stat. 305-06 (requiring the standard of review to apply to pending cases). With the exception of this standard, Diakite's petition for review is governed by the analytical framework in effect prior to the Act.

**B.      Legal framework**

A petition for withholding of removal is a request that the Attorney General halt removal proceedings if the alien's "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). An alien may satisfy his burden of proof for withholding of removal by demonstrating that he has suffered past persecution in the country of removal on account of one of the aforementioned reasons. 8 C.F.R. § 1208.16(b)(1)(i). This showing triggers a rebuttable presumption that his life or freedom would be threatened in the future if removed to that country. *Id*.

An applicant may alternatively seek withholding of removal by establishing that "it is more likely than not" that he would suffer harm in the future upon removal to his country—even if the applicant has not suffered past persecution. 8 C.F.R. § 1208.16(b)(2). This is a more demanding burden of proof than the one employed for evaluating asylum claims, which instead requires that an applicant establish a "well-founded fear of persecution." 8 C.F.R. § 1208.13(b)(2); *Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998).

Corroborating documents are not necessarily required to satisfy an applicant's burden of proof. "[T]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." *Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004) (citing 8 C.F.R. §§ 1208.13(a) and 1208.16(b)). Moreover,

> [a] credibility determination is considered a finding of fact and is reviewed under the deferential substantial evidence standard. Even so, the immigration judge's conclusion must be supported by specific reasons and must be based upon issues that

> go to the heart of the applicant's claim. In other words, [i]f discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility.

*Duan Ying Chen v. Gonzales*, 447 F.3d 468, 472 (6th Cir. 2006) (citations and internal quotation marks omitted); *but see* 8 U.S.C. § 1158(b)(1)(B)(iii) (as amended by REAL ID Act of 2005), which allows immigration courts to consider discrepancies in assessing credibility even if they do not go to the heart of the applicant's claim for applications filed after May 11, 2005.

The fact that credible testimony may suffice to establish a claim hardly means that applicants for withholding of removal should arrive at their merits hearings empty handed. Indeed, "where it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided . . . . The absence of such corroborating evidence can lead to a finding that an applicant has failed to meet [his or her] burden of proof." *Matter of S-M-J-*, 21 I&N Dec. 722, 725-26 (BIA 1997); *Abdulai v. Ashcroft*, 239 F.3d 542, 554 (6th Cir. 2001) (upholding the Board's requirement that "otherwise-credible applicants . . . supply corroborating evidence in order to meet their burden of proof"). Diakite's petition for review addresses whether the IJ's credibility determination and finding with respect to Diakite's lack of corroboration are supported by substantial evidence in light of the governing law set forth above.

**C.     The IJ's denial of withholding of removal is supported by substantial evidence**

Diakite's application for withholding of removal was denied by the IJ both because his story was not found credible and because he failed to provide corroboration where he could reasonably have been expected to do so. If Diakite's application had been denied solely on the basis of his lack of credibility, we would find this to be a very close case. This is because a number of the adverse

inferences drawn by the IJ do not strike us as being supported by substantial evidence. In particular, the circumstances of Diakites's alleged "escape" from prison in 1999 do not seem to us as inherently implausible, nor does the discrepancy as to whether his cousin Bakari is a police officer or a member of the military seem material. On the other hand, substantial evidence supports the adverse inferences drawn from Diakite's decision not to apply for asylum and from what the IJ characterized as Diakite's persistent failure to answer the questions posed to him.

We need not decide the soundness of the IJ's adverse credibility finding in order to resolve this case, however, because "[t]he absence of [reasonably available] corroborating evidence can lead to a finding that an applicant has failed to meet [his] burden of proof." *Matter of S-M-J-*, 21 I&N Dec. at 724-26. The IJ in this case found that Diakite could be reasonably expected to secure corroboration from Guinea because he was able to obtain letters from his uncle Amadou and his cousin Bakari. Nothing in the record adequately explains why he was unable to secure such documentation. We therefore have no basis for disturbing the IJ's finding that more corroboration was reasonably available.

There are major parts of Diakite's story where one would reasonably expect corroborating evidence, such as whether the RPG even existed in 1992, whether he was indeed a member of the group, whether he ever attended the University of Conakry, whether he was ever in the Sendoeta Military Camp or the Amdalaye prison, and whether the alleged protests in 1992 and 1999 actually took place. Diakite proffered nothing to corroborate these key allegations. In light of these deficiencies, and in the absence of a credible explanation for why Diakite did not provide evidence to cure them, we are not compelled to find that the IJ erred in determining that Diakite failed to

proffer sufficient corroboration to satisfy his burden of proof. *See Matter of S-M-J-*, 21 I&N Dec. at 724-26; 8 U.S.C. § 1252(b)(4)(D).

**D.      Relief under the CAT**

Turning now to Diakite's CAT-based claim, the government argues that the claim has not been administratively exhausted because it was not appealed to the BIA. We agree. Diakite's briefing on appeal to the BIA failed to mention, let alone develop, his CAT-based claim. We therefore decline to address the claim on the merits. 8 U.S.C. § 1252(d)(1) ("A court may review a final order of removal only if . . . the alien has exhausted all administrative remedies available to the alien as of right . . . .")

### III.  CONCLUSION

For all of the reasons set forth above, we **DENY** Diakite's petition for review.