**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0161n.06
Filed: February 24, 2009

No. 07-4267

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| SAMBA DIALLO, | ) | |
| | ) | |
| *Petitioner*, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE BOARD OF |
| | ) | IMMIGRATION APPEALS |
| | ) | |
| ERIC H. HOLDER, Jr., | ) | |
| United States Attorney General, | ) | |
| | ) | |
| *Respondent*. | ) | |
| | ) | |
| | ) | |

Before: **McKEAGUE** and **GRIFFIN, Circuit Judges**; **WEBER, Senior District Judge**.[*]

**PER CURIAM.** Petitioner Samba Diallo ("Diallo") seeks review of a decision by the Board of Immigration Appeals ("BIA"). The BIA upheld the decision of the Immigration Judge ("IJ") that Diallo was statutorily ineligible for asylum and he was not entitled to withholding of removal or protection under the Convention Against Torture ("CAT") because his testimony was incredible. For the reasons that follow, we find the BIA's decision is supported by substantial

---

[*]The Honorable Herman J. Weber, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

evidence and we therefore **DENY** the petition for review.

## I.

Diallo, a native and citizen of Guinea, entered the United States illegally on or about October 12, 2000. He subsequently filed an application for asylum with the former Immigration and Naturalization Service ("INS") on December 11, 2001.[1] The INS did not grant his application but instead commenced removal proceedings pursuant to § 237(a)(1)(B) of the INA, 8 U.S.C. § 1227(a)(1)(B). Diallo conceded removability. He thereafter renewed his application for asylum under § 208 of the INA, 8 U.S.C. § 1158, and, in the alternative, sought withholding of removal under § 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3), and protection under the CAT. Diallo based his request for relief on a claim of past persecution or a well-founded fear of future persecution on account of his political opinion and membership in a particular social group.

### A.     The Original Asylum Application

Diallo provided the following information in his original asylum application: He was born in Conakry, Guinea in 1974 and is a member of the Fulani ethnic group. He left Guinea because of mistreatment he and his family received at the hands of the government based on their Fulani ethnicity. Diallo and his parents were members of Mamadou Ba's political party.[2] His family's business was set on fire and he and his father were arrested by soldiers and detained at the Almamy Samory military camp. After his release from the military camp, his father helped him leave the country. Diallo left Guinea on October 11, 2001, and entered the United States on October 15, 2001,

---

[1]The INS became part of the Department of Homeland Security on March 1, 2003. Homeland Security Act of 2002, Pub.L.No. 107-296, Title IV, 116 Stat. 2135 (Nov. 25, 2002), as amended.

[2]Mamadou Ba is spelled "Mamdou Bah" elsewhere in the record.

after spending two days in Senegal.[3] Diallo feared being arrested and mistreated again by military soldiers if he were forced to return to Guinea.

**B.     The Amended Asylum Application**

Diallo filed an amended asylum application and supporting documentation with the assistance of counsel on May 10, 2004. In the amended application, he states as follows: He and his family experienced harm and mistreatment at the hands of the government of Guinea because they were members of the Union for Progress and Renewal, or UPR, a political party led by Mamadou Ba which had many black Fulani members. Diallo first joined the UPR in 1996. He worked at his father's general store in Conakry, where he and his father helped Mamadou Ba campaign by making t-shirts and other items in support of the UPR. In December 1999, several government soldiers came to his father's general store and interrogated him and his father about their involvement with the UPR. The soldiers beat Diallo's father with plastic cords and set the store on fire. They then arrested Diallo and his father and took them to a military prison in Almamy Samory, where they separated the two of them. Diallo described the conditions in the prison as "unspeakable." He was given only one meal a day and was forced to work like a slave. The soldiers regularly kicked him and beat him with whips and batons. After being detained for six months, he was released from prison in June 2000 when his father, who had been freed earlier, bribed the guards. Diallo's father arranged for him to escape to Mali the day after his release. Diallo remained in Mali for approximately four months before coming to the United States, where he arrived on October 15, 2000. He did not apply for asylum in Mali and is not eligible for permanent residence

---

[3]October 12, 2000, is also noted as the last date of entry on the application. That date is written in handwriting that appears to be different from the handwriting used to fill in the rest of the application.

there. Diallo fears that he will be detained and tortured by government soldiers if he is forced to return to Guinea because he and his father were very active in the UPR and President Lansana Conte and his ruling government oppose all political opposition parties with violence. Diallo has been unable to contact his father since he left Mali to come to the United States and he is unaware of his whereabouts or whether his family still supports or participates in the UPR. Diallo remains a member of the UPR, although his participation is limited because he is in the United States.

## C.      The Asylum Hearing

At the asylum hearing, Diallo gave the following testimony, which he alleges proves a well-founded fear of persecution and would thereby permit him asylum in the United States: He became a member of the UPR political party in 1996 and was politically active. His father was also a member of the UPR and a salesman who would buy t-shirts in China and then put the UPR name on them to sell at his store.[4] The t-shirts "never went directly to Mamdou Bah's office." His father also sold shoes and hats at the store. In 1998, his father bought some t-shirts in China that Diallo was supposed to pick up at the port of entry and take to their store. A tax official and policeman produced a document and told Diallo that he could not take the t-shirts but he instead had to leave them at the port. Diallo returned to his father, who paid money to have the merchandise released.

Diallo and his father had problems because of their membership and participation in the UPR. An arrest warrant was issued for Diallo in February 1999 for various acts committed in March

---

[4]The testimony was somewhat confusing as to what business Diallo and his father actually conducted at the shop. Although the IJ states in his opinion that Diallo testified that "he and his father made the t-shirts in his father's shop," Diallo actually testified his father made the t-shirts and then he and his father sold them in the shop. The IJ further stated that Diallo's father "also sold shoes, hats and other items, but only UPR merchandise." Diallo actually testified that they sold "t-shirts and shoes, hats, everything" and in response to the question of whether they sold UPR merchandise stated, "Yes. We sell them because the t-shirt (indiscernible) will sell it."

4

1998. In December 1999, eight to ten members of the military who were wearing green t-shirts and carrying weapons came to the store in a truck. They beat Diallo with plastic sticks. They told Diallo and his father that they could no longer run their business because it was supporting the UPR. The soldiers then burned the store and took Diallo and his father to the police station. The soldiers told Diallo that he and his father were being imprisoned so that they would not be able to support Mamadou Ba. Diallo was then separated from his father and taken to Almamy Samory. While imprisoned, he was treated like a slave and forced to farm and cut trees. He was beaten, kicked and mistreated by the guards. He was fed only once a day. He was detained for six months and released only after his father, who had been released earlier because of his age, paid a bribe. Neither Diallo nor his father was ever formally charged with a crime, but Diallo believes he and his father were arrested because they supported the UPR.

The day after his release from prison, on June 6, 2000, petitioner went to Mali by taxi. His father made the arrangements for him to leave Guinea and to stay in Mali with business acquaintances. Although Diallo's asylum application, which had been prepared by someone he met in Cincinnati, stated that he went to Senegal for two days, he never went to Senegal, he never told the person who prepared the application that he was in Senegal before coming to the United States, and he told the asylum officer that this statement was false.

Diallo required hospitalization upon his release from prison because he was dehydrated and had blood in his urine. He stayed in a hospital in Mali for 20 days and in Mali for a total of four months. He did not want to remain in Mali because he did not feel it was safe and all governments in Africa are the same. Although his asylum application states that he arrived in the United States in October 2001, this is incorrect as Diallo left Mali on October 13, 2000, and arrived in New York

5

on October 15, 2000. To gain entry into the United States, Diallo used travel documents he had bought from a businessman, who traveled to New York with him. After arriving in New York, he returned the documents to the businessman. Diallo knew it was illegal to use false documents to enter the United States, but he wanted to save his life. Diallo did not apply for asylum sooner than he did because he did not know anyone in the United States, he did not speak English very well, and he did not know what to do.

Diallo does not know if his father is still a member of the UPR. He has not spoken to his mother or father since leaving Guinea in 2000, and he does not know where they are. Diallo called a friend in 2004 and asked him to retrieve his UPR membership card and an arrest warrant from his house in Guinea. Diallo knows that his friend could not enter his house without speaking to his parents. He told his friend to tell his parents that he is not able to return to Guinea. Diallo had his identification card and birth certificate in his possession when he left Guinea because he had them with him when he was arrested and the prison guard returned them to him upon his release from prison.

Among the documents Diallo submitted in support of his application are copies of his birth certificate; his UPR membership card; his state identification card; three BBC News articles regarding opposition parties in Guinea; two Amnesty International articles about the security forces in Guinea; his "Bulletin of Hospitalization" (sic) from a Mali medical clinic; his medical file from the Mali clinic; his arrest warrant; and a tax bill for the year 1998 for "Mr. Waly Diallo" in the amount of "600,000." Also included in the record are the CIA World Factbook entry for Guinea and the 2004 State Department Country Report on Human Rights Practices for Guinea.

D.    **The IJ's Decision**

The IJ issued an order dated May 15, 2006, in which he denied the application for asylum, withholding of removal pursuant to § 241(b)(3) of the INA, and relief under the CAT. Initially, the IJ found that Diallo had failed to file his application for asylum within the one-year period of his last arrival in the United States as required by 8 C.F.R. § 1208.4(a)(2)(i) and that Diallo had failed to establish extraordinary circumstances as contemplated by the INA that would excuse his late filing. *See* 8 C.F.R. § 1208.4(a)(5). The IJ therefore determined that because Diallo's asylum application was not filed within the one-year deadline under INA § 208(a)(2)(B), 8 U.S.C. § 1158(a)(2)(B), the application was time-barred and Diallo was statutorily ineligible for asylum.

The IJ also found that Diallo was not a credible witness with regard to his claims of past persecution on the basis of "his actual or imputed political opinion" or any other protected ground. Further, the IJ determined that Diallo had failed to establish that it is more likely than not that he would be tortured either by, at the instigation of, or with the acquiescence of, a public official. The IJ found that Diallo was not a credible witness in regard to his claims of past persecution based "not only on his demeanor while testifying, but also the rationality, internal consistency, inherent persuasiveness of his testimony, and the manner in which [his] testimony is consistent with other evidence in the record." The IJ identified the following allegedly material inconsistencies in Diallo's applications and testimony: 1) Although Diallo claimed in both his testimony and in his asylum applications to be politically active, he could not identify his party, UPR, by its complete name despite repeated efforts by his counsel to elicit this information; 2) Diallo erroneously claimed that Mamadou Ba was the leader of the UPR even though the State Department Report for Guinea states that the deceased Siradiou Diallo had been the leader of the UPR and his widow Assiatou Bah had been elected to head the UPR in September 2004, and the Country Report indicates that Mamadou

7

Ba was the leader of the Union of Democratic Forces of Guinea [UDFG]; 3) Diallo's original asylum application fails to mention that Mali was his home for four months and instead states that he left Guinea, traveled to Senegal for two days, and then came to the United States; 4) Diallo claimed in his original asylum application that he left Guinea on October 11, 2001, and arrived in the United States on October 15, 2001, with no mention of traveling to Mali, but in his amended asylum application and in his testimony, Diallo claimed to have left Guinea in June 2000 for Mali, where he remained for four months before coming to the United States; and 5) Diallo informed the Asylum Officer at his interview that the pro-Mamadou Ba t-shirts were shipped directly to Mamadou Ba's office, but he stated in his testimony that the t-shirts were not sent to Mamadou Ba's office.

In addition, the IJ found certain portions of Diallo's testimony and asylum applications to be implausible. Specifically, the IJ found it implausible that Diallo had his birth certificate and ID in his possession at the time of his arrest at his father's store and that he was able to get the guard to return the documents to him when he was released from prison. Second, the IJ considered it implausible that Diallo had not communicated with his mother and father since leaving Guinea in light of his testimony that his friend had retrieved his UPR card from Diallo's house in Guinea the year prior to the hearing.

As a final matter, the IJ determined that Diallo was not credible based on his demeanor. The IJ made the following findings in this regard:

> Additionally, Respondent's demeanor during his testimony is troubling to the Court. The Court often hears horrific tales of torture and abuse. Usually, there is extensive emotional resonance to such testimony in truthful narratives. Unless there is medical evidence of severe Post-Traumatic Stress Disorder (PTSD), the absence of any emotional resonance raises doubts in the Court's mind regarding the veracity of claims of severe abuse. Respondent testified in a matter-of-fact voice, neither detached nor emotive, and lacking in detail, regarding his father's store being burned

8

and the daily beatings he endured during six months of "slavery." Given the above, the Court has serious doubts regarding Respondent's claimed history of past persecution in Guinea.

The IJ found that because Diallo's testimony was not credible, he needed corroboration to bolster his claims. The IJ noted that Diallo had submitted some unauthenticated documentary evidence, including a "purported" arrest warrant and hospitalization records, but the documents failed to meet the corroboration requirements of *In re Matter of S-M-J-*, 21 I. & N. Dec. 722 (BIA 1997). Specifically, the IJ found that Diallo had no credible foundation for obtaining the documents he did submit, such as mail envelopes or statements from his Guinean friend. The IJ also found it troubling that despite the fact that Diallo had been represented by experienced immigration counsel for approximately 18 months preceding the hearing, he had not offered key corroboration for his claim of past persecution and fear of future persecution through reasonably available witnesses and documentation, such as a statement from his father or from UPR members in Guinea regarding his participation in the UPR and his arrest, or a statement from his father's friend in Mali with whom he had stayed.

### E.    The BIA's Order

The BIA determined that Diallo was not excused from the generally applicable one-year deadline for filing an application for asylum and affirmed that ruling for the reasons stated by the IJ.[5] The BIA further concluded that the IJ's adverse credibility finding was not clearly erroneous and that it provided a sound basis for denying each of Diallo's applications for relief from removal. The BIA

---

[5]Diallo does not appeal this ruling. Nor could he successfully challenge the ruling since his reasons for failing to file his original asylum application within one year of his last arrival in the United States - i.e., he was not represented by counsel at the time, he did not speak English fluently, and he was unfamiliar with the laws of the United States - are not "extraordinary" given that a large number of asylum-seekers undoubtedly face similar obstacles.

agreed with the IJ's finding that Diallo had provided "conflicting statements regarding the alleged mistreatment he experienced in Guinea." Specifically, Diallo could not identify the UPR by its complete name despite claiming that he was an active UPR member who had sold merchandise in support of the UPR; his testimony that Mamadou Ba is the leader of the UPR was contradicted by the Country Reports indicating that Assiatou Bah was elected to head the UPR in September 2004 and Mamadou Ba is the leader of the UDFG; while Diallo explained during his asylum interview that the UPR t-shirts were shipped directly to Mamadou Ba's political offices, he testified during his hearing that the t-shirts were sold in his father's store; and Diallo provided conflicting statements regarding whether he had lived in Mali before traveling to the United States.

**II**.

Diallo claims that the BIA erred in affirming the IJ's decision because (1) substantial evidence does not support the IJ's unfounded credibility determination, (2) his due process rights to a fair and full hearing were violated because his interpreter was not competent, and (3) the IJ erred in denying him withholding of removal and relief under the CAT because he proved it is more likely than not he will be persecuted if he returns to Guinea. Diallo argues that the adverse credibility determination is erroneous because the IJ relied on minor, irrelevant inconsistencies in his testimony that do not go to the heart of his claim. Diallo alleges that his inability to specify the UPR's full name was a clear case of miscommunication and is entirely irrelevant; the IJ and the respondent's assertions concerning Mamadou Ba's involvement in the UPR are factually inaccurate; the IJ's assertions that Diallo made an implausible statement concerning communication with his parents and that it was implausible for him to have his birth certificate and ID with him both at the time of his arrest and upon his release from prison are not supported by the transcript of his testimony; and

10

the adverse credibility determination was improperly based, in part, on the IJ's personal opinion. Diallo further argues that the IJ improperly rejected material and relevant documentary evidence that is consistent with his testimony, and the IJ ignored the Country Reports which support his credible testimony.

## III.

When, as here, the BIA adopts the IJ's decision with limited additional commentary, we review the decision of the IJ as supplemented by the BIA as the final administrative order. *See Ceraj v. Mukasey,* 511 F.3d 583, 588 (6th Cir. 2007) (citing *Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005)). We review the legal determinations of the IJ and BIA de novo. *Zoarab v. Mukasey*, 524 F.3d 777, 780 (6th Cir. 2008). We review factual determinations under the substantial evidence standard. *Id*. This means "we must uphold the administrative decision if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Id*. To reverse the BIA's determination under this deferential standard, we "must find that the evidence 'not only supports a contrary conclusion, but indeed *compels* it.'" *Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006) (emphasis in original).

## IV.

### A.    Procedural Due Process

Diallo claims that he was denied his due process rights in connection with his hearing because the transcript reflects that the interpreter had substantial difficulty understanding him and could not translate his words on several occasions, which prejudiced him because the IJ denied his application based on his testimony. Respondent claims that this argument is not properly before the court because Diallo did not present a due process claim to the BIA and thus failed to preserve the

11

issue for appellate review. Respondent claims that in any event, Diallo has not shown that the translation at the hearing, which was conducted in French at his request, was inadequate and that he was denied a full and fair hearing as a result of any mistakes.

Aliens are entitled to due process of law in deportation proceedings. *Denko v. INS,* 351 F.3d 717, 726 (6th Cir. 2003) (citing *Reno v. Flores,* 507 U.S. 292, 306 (1993)). Due process requires that an alien be afforded a full and fair hearing. *Castellano-Chacon v. INS,* 341 F.3d 533, 553 (6th Cir. 2003). To establish a due process violation in deportation proceedings, an alien must demonstrate "error and substantial prejudice." *Gishta v. Gonzales*, 404 F.3d 972, 979 (6th Cir. 2005).

An appellate court cannot consider a due process challenge that involves a correctable procedural error unless the alien has first presented that claim to the BIA. *Sterkaj v. Gonzales*, 439 F.3d 273, 279 (6th Cir. 2006). "A due process challenge alleging a failure to be heard meaningfully because no interpreter was provided is procedural in nature and therefore must be raised before the BIA." *Capric v. Ashcroft*, 355 F.3d 1075, 1088 (7th Cir. 2004); *see also Shehu v. Gonzales*, 151 Fed. Appx. 437, 441 (6th Cir. 2005) (citing *Gishta*, 404 F.3d at 978) (a claim of a due process violation based on an interpreter's inability to properly and adequately translate testimony in proceedings before an IJ is waived if the alien fails to complain about the interpreter's alleged deficiencies during the hearing). Because Diallo's claim that he was denied competent translation services at the hearing alleges a procedural error, he was obligated to raise this claim before the BIA so as to allow the BIA an opportunity to correct the error. Diallo waived this claim by failing to do so. He is therefore precluded from pursuing the claim on appeal.

Assuming Diallo had adequately presented his due process claim to the BIA, we would find

12

the claim to be without merit. Diallo argues that "the record is replete" with instances where the interpreter was unable to translate his testimony, but he points to only a handful of instances where the interpreter was unable to translate his testimony precisely. There is no indication in the record that the difficulty with the translation stemmed from the inadequacy of the translator. In the four instances cited by Diallo where the interpreter had difficulty translating his testimony, the interpreter simply asked that the question be repeated once, he stated at one point that he did not know the English translation of a word, and he explained on two occasions that Diallo was not speaking French. Moreover, the problems noted by Diallo were minor in that he was still able to convey that he was beat with a plastic implement and to explain how he traveled to Mali, so there is no reason to believe that the outcome of the proceeding would have been different had the translation issues not occurred. Thus, Diallo cannot establish a violation of his due process rights based on the translation issues he cites.

## B. Withholding of Removal/Relief Under the CAT

To be entitled to relief on an application for withholding of removal, an alien must establish that there is a clear probability that his "life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." *Vasha v. Gonzales*, 410 F.3d 863, 875 (6th Cir. 2005) (quoting 8 C.F.R. § 1208.16(b)). An alien satisfies the "clear probability" standard if he demonstrates "it is more likely than not" he would be subject to persecution on the basis of a protected ground if he were removed. *Fang Huang v. Mukasey*, 523 F.3d 640, 651 (6th Cir. 2008) (quotation omitted). To qualify for protection under the CAT, the alien must show that "he would more likely than not be subjected to torture after being deported" to his home country. *Ceraj*, 511 F.3d at 594 (citing 8 C.F.R. §

1208.16(c)(2)).

A finding that a petitioner lacks credibility is a sufficient basis to deny withholding of removal and protection under the CAT. *Zhuang v. Mukasey*, No. 07-4353, 2008 WL 5272777, *6 (6th Cir. Dec. 18, 2008) (unpublished decision). A credibility determination is a finding of fact subject to the substantial evidence test. *Ndrecaj v. Mukasey*, 522 F.3d 667, 674 (6th Cir. 2008). Thus, an appellate court may not reverse an IJ's credibility determination merely because it would have reached a contrary conclusion. *Id.* Rather, the reversal of an adverse credibility determination is warranted only where "any reasonable adjudicator would be compelled to conclude to the contrary." *See Hassan v. Gonzales*; 403 F.3d 429, 434 (6th Cir. 2005); 8 U.S.C. § 1252(b)(4)(B).

Although "an adverse credibility finding is afforded substantial deference, the finding must be supported by specific reasons." *Id.* In addition, "[a]n adverse credibility finding must be based on issues that go to the heart of the applicant's claim. [It] cannot be based on an irrelevant inconsistency. If discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility." *Id.*[6] A determination that testimony is not credible is properly supported when it is based on testimony that is inconsistent, contradicts current country conditions, or is inherently improbable. *Matter of S-M-J-*, 21 I. & N. Dec. at 731. While omissions of fact in an asylum application or during testimony alone might not support an adverse credibility determination, the omission of key events coupled with numerous inconsistencies may provide a specific and cogent reason to support an adverse credibility finding. *Matter of A-S-*, 21

---

[6]The REAL ID Act of 2005, Publ L. No. 109-13, Div. B, § 101(h)(2), 119 Stat. 231 at 302 (2005), now allows consideration of inconsistencies, inaccuracies or falsehoods that do not go to the heart of the claim, but only for applications filed after May 11, 2005, the effective date of the enactment. *See Koba v. Mukasey*, 546 F.3d 741, 749 n. 1 (6th Cir. 2008). Because petitioner filed his application before that date, the standard set forth in *Hassan* applies to this case.

I. & N. Dec. 1106, 1110 (BIA 1998).

An applicant is not necessarily required to submit corroborating documents in order to satisfy his burden of proof. "[T]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." *Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004) (citing 8 C.F.R. §§ 208.13(a); 208.16(b)). Where, however, it is reasonable to expect an applicant to provide corroborating evidence for certain alleged facts pertaining to the specifics of his claim, failure to provide such evidence without an adequate explanation can support a finding the applicant has failed to meet his burden of proof. *Abdulai v. Ashcroft*, 239 F.3d 542, 554 (6th Cir. 2001); *Matter of S-M-J-*, 21 I. & N. Dec. at 725-26. A reviewing court may not reverse an agency finding as to the availability of corroborating evidence unless the court is compelled to conclude that such evidence is unavailable. 8 U.S.C. § 1252(b)(4).[7]

We find that the adverse credibility determination in this case is supported by substantial evidence and must be upheld. We reach this result despite our conclusion that the IJ and the BIA erred in determining that Diallo's testimony was deficient in three pertinent respects. The first such credibility issue involves the IJ's determination that Diallo "erroneously claimed Mamadou Ba to be the leader of the UPR." The problem with this determination is the IJ relied on evidence regarding the political situation in Guinea in 2004, which was several years after Diallo had left the country. There is no evidence in the administrative record to show that Diallo's assertion is erroneous insofar as it pertains to the relevant time period, i.e., the period when Diallo was living

---

[7]The REAL ID Act of 2005 added this standard to the statutory scheme and made this particular provision, unlike most provisions of the Act, applicable to pending cases. *See Diakite v. Mukasey*, No. 08-3500, 2009 WL 68170, **5-6 (6th Cir. Jan. 8, 2009) (unpublished decision) (citing Pub. L. No. 109-13, Div. B, § 101(h)(3), 119 Stat. 231 at 305-06).

in Guinea and was allegedly active in the UPR. The second credibility issue of concern is the IJ's finding that despite repeated efforts by Diallo's counsel to elicit from him the full name of the UPR, Diallo was unable to identify the UPR by its complete name. It is not clear from the exchange between counsel and Diallo on which the IJ relies whether Diallo did not know the full name of the UPR or whether he did not understand what information he was being asked to provide. Thus, this portion of the testimony does not provide a reasonable basis for concluding that Diallo was not credible. Third, although the IJ found it implausible that Diallo had his birth certificate and ID with him when he was arrested at his father's store and that he was able to get the prison guard to return these documents to him upon his release, the IJ does not suggest that the documents themselves are forged or that Diallo is not who he claims to be. Accordingly, the IJ's doubts concerning this testimony are not sufficient to call Diallo's credibility into question.

The IJ did, however, properly rely on other credibility issues which go to the heart of Diallo's claim and which preclude us from concluding that any reasonable adjudicator would be compelled to reach a different result. The IJ reasonably relied on the inconsistent accounts given by Diallo as to whether the t-shirts supporting the UPR were sold at his father's store or whether they were shipped directly to Mamadou Ba's office. The crux of Diallo's claim is that he was arrested and imprisoned for engaging in business activities that supported Mamadou Ba's opposition party. As the business activities go to the heart of the asylum claim, the IJ was entitled to rely on discrepancies in Diallo's accounts as to how he and his father conducted their business in finding that Diallo was not credible.

In addition, the IJ was entitled to conclude that it was implausible that Diallo had not communicated with his parents since leaving Guinea in light of all of the testimony Diallo provided.

16

Diallo testified that he had called a friend in Guinea the year before the hearing and asked him to retrieve his UPR card from his house, and the friend had obtained Diallo's UPR card and arrest warrant for him. Diallo also testified that his friend could not have entered his house without speaking to his parents. It is reasonable to expect that if Diallo was able to send a friend to his parents' house in Guinea, and if the friend had to have spoken with Diallo's parents before retrieving documents from the house and sending them to Diallo, then Diallo would know the whereabouts of his parents. The inherent inconsistencies between Diallo's testimony concerning the retrieval of documents from his house and his testimony that he did not know where his parents were, he had been unable to communicate with them since leaving Guinea, and he could not obtain a letter from his father because he did not know how to accomplish that, are sufficient to cast doubt on his credibility.

The IJ also properly relied on discrepancies in Diallo's accounts concerning his travels after leaving Guinea. Whether Diallo spent time in Mali has an important bearing on his persecution claim because he has submitted evidence that he was treated in Mali for injuries that resulted from beatings and maltreatment he allegedly experienced during his imprisonment in Guinea. Yet, Diallo omitted from his original asylum application the important detail that he went to Mali for four months after leaving Guinea, despite the fact that the asylum application expressly asks the applicant to describe in detail his trip to the United States from his home county and asks whether he traveled through, or resided in, any other country before entering the United States. In the application, Diallo indicated that he last left Guinea on October 11, 2001, and entered the United States on October 15,

2001.[8] Diallo states in the application that he "left Guinee (sic) and came to Senegal for 2 days and then I came to United State (sic)." At the hearing, Diallo offered a completely different version of his travels. He testified that he went to Mali on June 6, 2000, the day after he was released from prison, he stayed in a hospital there for 20 days, and he then stayed with a friend of his father's, so that he was in Mali a total of four months. He testified that he left Mali on October 13, 2000, he arrived in the United States on October 15, 2000, and the October 2001 date on his original asylum application was a mistake that was made because he did not know how to read English. Diallo also testified in response to questioning about the asylum application that he never went to Senegal, he told the officer at the asylum interview that he never went to Senegal, and he informed the officer that the statement in the asylum application that he had done so was false. Diallo never adequately explained at the asylum hearing, however, why his original asylum application stated that he went to Senegal, and he offered no explanation for why he omitted to mention in the asylum application that he went to Mali for four months. This was a critical discrepancy, and the IJ was entitled to rely on it to discount Diallo's credibility.

In light of the deficiencies in Diallo's testimony and the inconsistencies between his testimony and his asylum applications, the IJ was entitled to require Diallo to provide additional corroborating evidence to document his activities on behalf of the UPR and his stay in Mali. There is no basis for disturbing the IJ's finding that Diallo could have obtained letters from his father and from the individual in Mali with whom he had stayed. Diallo failed to adequately explain why he had been unable to communicate with his father since leaving Guinea, even though he testified that

---

[8]As mentioned earlier, October 12, 2000, is also noted as the date of entry on the original asylum application. The IJ found that Diallo entered the United States on or about that date.

18

he had been able to obtain his UPR card and his arrest warrant from a friend who went to his father's house the preceding year and who would have spoken to his father at that time. Nor does the record indicate why Diallo would have been unable to obtain corroborating evidence of his time in Mali beyond his twenty-day hospitalization. Diallo provided no explanation at the hearing for the lack of corroborating evidence of his extended stay in Mali.

As a final matter, we are not in a position to disturb the IJ's assessment of Diallo's credibility based on his demeanor. The IJ is in the best position to determine credibility based on the demeanor of the witness and the presentation of testimony. *See Gjolaj v. Keisler,* 252 Fed.Appx. 64, 68 (6th Cir. 2007). The IJ found Diallo's demeanor troubling because he testified in a "matter-of-fact voice, neither detached nor emotive, and lacking in detail, regarding his father's store being burned and the daily beatings he endured during six months of 'slavery.'" The IJ gave legitimate, in-depth reasons for discounting Diallo's credibility based both on his observation of aliens who had testified before the IJ as to similar experiences and the deficiencies and inconsistencies in Diallo's testimony. These reasons constitute substantial evidence to support the IJ's adverse credibility determination.

Because we are bound to uphold the IJ's adverse credibility determination as supported by substantial evidence, it follows that we must uphold the IJ and BIA's finding that Diallo has not met his burden of proof for withholding of removal or relief under the CAT.

**V.**

For the foregoing reasons, we **DENY** Diallo's petition for review of the BIA's removal order.