NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0424n.06
Filed: July 16, 2008

No. 07-3453

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| NERTIL MULLAJ, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE BOARD OF |
| | ) | IMMIGRATION APPEALS |
| MICHAEL B. MUKASEY, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | |

Before: NORRIS, BATCHELDER, and GIBBONS, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. Petitioner-appellant Nertil Mullaj seeks review

of the Board of Immigration Appeals' ("BIA") order of removal. Mullaj argues that the BIA erred

by: (1) adopting and affirming the Immigration Judge's finding that Mullaj was not credible; and (2)

denying Mullaj's applications for asylum, withholding of removal, and protection under the

Convention Against Torture ("CAT"). For the following reasons, we deny Mullaj's petition for

review.

I.

Nertil Mullaj ("Mullaj") is a native and citizen of Albania. On December 12, 2001, he

entered the United States at the Miami International Airport. He was 17 years old at his time of

entry. Upon entering the United States, Mullaj was questioned under oath by an immigration officer.

-1-

During the questioning, Mullaj stated that he had two sisters and one brother who were both permanent residents of the United States. He also stated, "I came [to the United States] because I was in danger in my country and I came here to work and reunite with my family." In explaining how he arrived in the United States, Mullaj stated, "I left Albania two months ago. Went to Amsterdam, one night and two months in the Dominican Republic in a hotel. Then Guadaloupe [sic] for 3 days in a hotel and Port-au-Prince just transit." Mullaj also stated that he had no documents with him and that some people helped him to travel from Albania to Guadeloupe by providing him with a Norwegian passport, which was taken away from him before he boarded the airplane in Port-au-Prince. Mullaj also explained that his "father is a democrat and the [S]ocialist [P]arty is in power now so my family has been harassed."

Mullaj subsequently filed for asylum, withholding of removal and protection under the CAT. In the application, Mullaj described his experiences in Albania as follows:

> I am seeking political asylum in the United States because I have been persecuted, threatened and beaten due to my political beliefs and my involvement with [the Democratic Party ("DP")]. On April 2001, I was beaten while participating in a DP demonstration in K[o]rca. On May 21, 2001, I was distributing DP propaganda in K[o]rca. Socialist party agents and members, brutally attacked me. They threatened to kill me if I continued spreading democratic propaganda. The next day, I was beaten while I was giving a speech to my fellow students in the school. In June 2001, socialist police beat me because I was passing out DP materials in front of voting booth no.3 in K[o]rca. I was also arrested the same day and beaten while in police custody. In the beginni[n]g of August, the police came to my home tied me to a chair and beat me while others were searching for to [sic] the youth form DP minutes [sic]. My house was torn apart and a lot of objects were broken. In late September, I was kidnapped on my way to a meeting in K[o]rca. I was beaten once again because my beliefs were against the socialist party and government in Albania.

Mullaj also described his involvement in the Democratic Party as follows:

> I am a member of DP. . . . I was personally involved in many activities that DP organized not only in Bllisht, but K[o]rca and other suburbs too. I was also engaged

in public relations with DP, especially during the elections of 2001. I also distributed pamphlets and other materials for DP and its members.

Based on these facts, Mullaj concluded, "If I return to Albania, I would be killed by [the] current socialist government."

During his oral testimony, Mullaj recounted the details of several incidents where he claims to have been subjected to threats and violence because of his membership in the Democratic Party: (1) in April of 2001, Mullaj participated in a Democratic Party youth demonstration where police beat the participants; (2) on May 21, 2001, Mullaj was threatened and beaten by members of the Socialist Party for distributing Democratic Party fliers; (3) on May 22, 2001, Mullaj was beaten in his school in Belich (phonetic spelling) by two Socialist Party bodyguards after holding a Democratic Party meeting; (4) in June of 2001, Mullaj was beaten by Socialist Party policemen in a recreational park located in Korca for passing out Democratic Party fliers and then arrested and taken to a police station for additional beatings; (5) in August of 2001, five police officers broke into Mullaj's house, beat him and ransacked the house; (6) in September of 2001, Mullaj was stopped and forced into a police car while on his way to a Democratic Party youth meeting; told that he would be killed if he continued to participate in such activities; and then thrown from the car, fracturing his wrist.

During cross-examination, a number of inconsistencies arose in Mullaj's overall testimony. First, despite his contention that he demonstrated, distributed fliers and organized meetings for the Democratic Party, Mullaj was unable to identify the names of any of his superiors at the Democratic Party, save the head of the entire organization; this was peculiar given that it would stand to reason that, being a low-level member of the Democratic Party, Mullaj would presumably have had to receive orders from someone within the organization.

Also, Mullaj's testimony before the immigration judge ("IJ") regarding the June 2001 incident differed from his description of the event in his asylum application. In his asylum application, Mullaj stated that the June 2001 incident occurred in Korca while he was "passing out DP materials in front of voting booth no.3." However, under cross-examination, he stated that the incident occurred in a recreational park and that he did not recall any details about the upcoming election.

Furthermore, Mullaj, upon entering the United States, told the immigration officer that he had not been arrested. However, his asylum application clearly states that he was arrested by the police. According to Mullaj, he did not include his arrest because he thought the question referred to criminal arrests and not politically motivated arrests; in addition, he was never charged by the police.

Mullaj also failed to mention any of the incidents mentioned in his oral testimony at his initial interview with an immigration officer; instead, Mullaj simply stated that he was in danger in Albania and that he came to the United States to work and reunite with his family.

Mullaj's claims regarding the September incident also came under heavy questioning. According to Mullaj's asylum application, the September incident occurred in "late September." However, Mullaj's passport contained stamps clearly indicating that he had left Albania on August 24, 2001 and entered the Dominican Republic on September 5, 2001. Mullaj, in response, claimed that the stamps were forged by two individuals who helped him with his travel arrangements and that in fact he left Albania in October of 2001.[1] Mullaj provided no evidence to substantiate this claim

---

[1] In his asylum application, Mullaj did not respond to the question asking when he last left his home country.

besides the first names of these mysterious individuals.

Mullaj's mother also testified before the IJ. Although she stated that she saw Mullaj's bruises and other effects of the treatment he allegedly received at the hands of the Socialist Party police, she admitted that she never saw any of the actual incidents described by Mullaj.

In summarizing her conclusion that Mullaj was not "credible in the least," the IJ noted all the above inconsistencies and omissions. In doing so, the IJ emphasized that the contradiction between Mullaj's passport and his allegations regarding an incident in late September 2007 "completely undermined" Mullaj's credibility. Having found him not credible, the IJ concluded that Mullaj had not satisfied his burden of establishing eligibility for the relief of asylum, withholding of removal, or withholding under the CAT.

In a *per curiam* decision dated March 14, 2007, the BIA adopted and affirmed the decision of the IJ. In doing so, the BIA noted that it did not find the IJ's adverse credibility determination clearly erroneous. Mullaj now appeals.

## II.

"We review de novo the legal determinations made by the IJ or BIA, but review factual findings under the deferential 'substantial evidence' standard." *Zoarab v. Mukasey*, 524 F.3d 777, 780 (6th Cir. 2008). "Where the BIA adopts the IJ's reasoning, the court reviews the IJ's decision directly to determine whether the decision of the BIA should be upheld on appeal." *Gilaj v. Gonzales*, 408 F.3d 275, 282-83 (6th Cir. 2005). The IJ's findings of fact are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Thus, the IJ's determination should be upheld unless evidence "not only supports a contrary conclusion, but indeed *compels* it." *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003) (internal citation

omitted and emphasis in original).

III.

"While an adverse credibility finding is afforded substantial deference, the finding must be supported by specific reasons." *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004). Moreover, "[a]n adverse credibility finding must be based on issues that go to the heart of the applicant's claim. They 'cannot be based on an irrelevant inconsistency.'" *Id*. (quoting *Daneshvar v. Ashcroft*, 355 F.3d 615, 619 n.2 (6th Cir. 2004)). Thus, "[i]f discrepancies 'cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility.'" *Id.* (quoting *Daneshvar*, 355 F.3d at 623 (quoting *Shah v. INS*, 220 F.3d 1052, 1068 (9th Cir. 2000))); *see also Bah v. Gonzales*, 462 F.3d 637, 641-42 (6th Cir. 2006) (upholding adverse credibility determinations where the discrepancies involved the alien's alleged involvement in a political organization and treatment by the government of Guinea).

The IJ found discrepancies in Mullaj's story that clearly went to the heart of the applicant's claim. Most notably, the IJ found that the fact that Mullaj's passport indicated he was not in Albania when the alleged September incident took place "completely undermined" Mullaj's credibility. Furthermore, Mullaj's response – that he did not know anything about the stamps and that his passport was forged by individuals who aided him in his travels – simply seemed too incredible to the IJ, especially given that the passport had been in Mullaj's possession since he arrived in the United States.

In addition, Mullaj's claims about his participation in the Democratic Party were undermined by his inability to provide the names of any of his superiors in the Democratic Party. And, the inconsistencies in Mullaj's story – most specifically, the location of the April 2001 incident – also

-6-

served as an additional indication that Mullaj's story was simply not credible.

Together these inconsistencies and memory lapses all undermined key elements of Mullaj's claims of persecution. In turn, these facts leave no doubt that the IJ's adverse credibility determination was supported by substantial evidence.

IV.

"The IJ, acting for the Attorney General, has discretion to grant asylum to any alien who qualifies as a 'refugee.'" *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (citing 8 U.S.C. § 1158(a), (b)). Under 8 U.S.C. § 1101(a)(42)(A), 'refugee' is defined as any alien "who is unable or unwilling to return to" her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Under this framework, an IJ's asylum determination "involves a two-step inquiry: (1) whether the applicant qualifies as a 'refugee' as defined in § 1101(a)(42)(A), and (2) whether the applicant merits a favorable exercise of discretion by the [IJ]." *Yu*, 364 F.3d at 702 (quoting *Ouda*, 324 F.3d at 451). Although an asylum applicant bears the burden to prove that he or she is a refugee, the applicant's uncorroborated testimony – if credible – may be sufficient to sustain this burden. 8 C.F.R. § 208.13(a). However, "[w]hile an applicant could theoretically establish this burden of proof through corroboration as opposed to her own credible testimony, an adverse credibility determination is generally fatal to an application for asylum, withholding of removal, or CAT relief." *Paul v. Mukasey*, 2008 U.S. App. LEXIS 9622, at *15 (6th Cir. May 2, 2008); *see also Yosd v. Mukasey*, 514 F.3d 74, 80 (1st Cir. 2008) (noting that "an adverse credibility determination, if supported by a specific, cogent, and supportable explanation, is generally fatal to an asylum applicant's claim for relief") (internal quotation marks and citations omitted)).

-7-

In addition, "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). To show this, an applicant "must demonstrate that there is a clear probability that he would be subject to persecution" if he or she were to return to his or her home country. *Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998). Although an asylum applicant bears the burden to prove that he or she is a refugee, the applicant's uncorroborated testimony – if credible – may be sufficient to sustain this burden. 8 C.F.R. § 1208.16(b). Because this burden is higher than the burden required to demonstrate asylum eligibility, "an alien who fails to qualify for asylum necessarily does not qualify for withholding of removal." *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005) (citing *Pilica v. Ashcroft*, 388 F.3d 941, 955 (6th Cir. 2004)); *see also Mikhailevitch*, 146 F.3d at 391.

In denying Mullaj's petition, the IJ first noted that, because of the adverse credibility determination, Mullaj had failed to satisfy his evidentiary burden to demonstrate eligibility for asylum and withholding of removal. The IJ also considered the merits of Mullaj's claim, assuming *arguendo* that the incidents alleged did in fact occur. The IJ concluded, however, that, even assuming Mullaj was credible, his petition could not be granted. In doing so, the IJ referenced the following factors: (1) according to the country condition information provided by the State Department, conditions in Albania have significantly changed; (2) Mullaj's story lacked "significant overt acts" of persecution; and (3) the fact that Mullaj left Albania for Bulgaria prior to his final departure from Albania, stayed in Bulgaria, and despite having found safe haven in Bulgaria, returned to Albania.

The IJ also went on to note that evidence of Mullaj's participation in the Democratic Party did not exist and that Mullaj did not present any evidence – save a scar on his chin – of persecution while in Albania.

Given the foregoing facts and factors, the IJ correctly determined that Mullaj has simply not satisfied his burden to demonstrate that he is eligible for asylum or withholding of removal.

V.

"An applicant seeking relief under the Convention Against Torture has the burden of proving that it is more likely than not that he will be tortured if removed to the proposed country." *Berri v. Gonzales*, 468 F.3d 390, 397 (6th Cir. 2006)(citing 8 C.F.R. § 208.16(c)(2)). "Torture" is defined in relevant part as:

> any act by which severe pain or suffering . . . is intentionally inflicted on a person for such purposes as . . . intimidating or coercing him or her . . . for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 1208.18 (a)(1). "In deciding whether torture is more likely than not to occur upon the applicant's return to the country, we 'consider the possibility of future torture, including any evidence of past torture inflicted upon the applicant and evidence that the applicant is not likely to be tortured in another area of the country of removal." *Berri*, 468 F.3d at 398 (quoting *Ali v. Reno*, 237 F.3d 591, 596-97 (6th Cir. 2001)).

Given the inconsistencies in Mullaj's story, his general lack of evidence, and the IJ's adverse credibility determination, Mullaj has not satisfied his burden to demonstrate that torture is more likely than not to occur if he returns to Albania. As a result, the IJ correctly denied Mullaj relief under the CAT.

VI.

For the foregoing reasons, we deny the petition for review and affirm the decision of the IJ.