NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0709n.06

No. 12-4066

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Aug 02, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| AHMED ALI, | ) | |
| | ) | |
| Petitioner, | ) | ON PETITION FOR REVIEW OF |
| | ) | THE DECISION OF THE BOARD |
| v. | ) | OF IMMIGRATION APPEALS |
| | ) | |
| ERIC H. HOLDER, JR., Attorney General of the | ) | |
| United States, | ) | OPINION |
| | ) | |
| Respondent. | ) | |
| | ) | |

Before:  ROGERS and DONALD, Circuit Judges; ANDERSON, District Judge.[*]

   **BERNICE BOUIE DONALD, Circuit Judge.**  Ahmed Ali, a citizen of Pakistan, claims that he would be subjected to political persecution if he returned to his home country.  After an immigration judge and the Board of Immigration Appeals (BIA) denied his application for asylum, withholding of removal, and protection under the U.N. Convention Against Torture (CAT), Ali filed a petition for review.  He asserts that the BIA's credibility and lack of corroboration determinations were not supported by substantial evidence.  We disagree, and **DENY** his petition for review.

_____

   [*] The Honorable S. Thomas Anderson, United States District Judge for the Western District of Tennessee, sitting by designation.

I.

Ahmed Ali is a thirty-year-old native and citizen of Pakistan. In 1997, he decided to follow in his father's political footsteps by joining the Muslim League. He served as the party's fundraising secretary and as a recruiter.

The Muslim League was at loggerheads with Pervez Musharraf, a military general who ascended to power in 1999. With the political tides changing, Ali's life became more difficult. Police officers arrested Ali on July 21, 2000 for participating in a march protesting Musharraf's regime. They detained him for one day and beat him with shoes and sticks, causing Ali to bleed. Having never been told what the charges against him were, Ali was released after his father posted bail.

On January 7, 2001, Ali participated in a hunger strike protesting the Musharraf government; once again, he was arrested. This time, he spent three days in jail. During his detention, he was beaten, occasionally denied food, and repeatedly asked to sign documents disavowing his own party. On the third day, when Ali refused to sign the disavowal documents, a police officer threw Ali to the floor. Ali hit his head, began bleeding from it, and lost consciousness.

He woke up in the intensive-care unit (ICU) of a hospital, allegedly with eight stitches on his head. After two days in the ICU, Ali was transferred to a private room. Police officers were stationed outside Ali's door, waiting to re-arrest him and accompany him back to the local station. To escape, Ali jumped out of his second-story hospital window, landing without serious injury to himself.

At the direction of his father, Ali left his hometown of Lahore and headed to Karachi. Once in Karachi, he hid from authorities by staying at the home of his father's friend.

The day after Ali's hospital escape, police officers went to his family's home. They harassed Ali's mother and arrested his brother Tariq, beating him in the process. Fearing for his life and in search of escape from police harassment, Tariq left for Spain. The police eventually returned to the home, antagonizing Ali's mother once more and arresting Ali's father. They placed Ali's father in confinement and occasionally beat him. After a week, he was released. In response to such harassment, Ali's mother joined Tariq in Spain, while Ali's father went into hiding.

For almost six months, Ali hid in Karachi. He left Pakistan on June 10, 2001, accompanied by a man named Sharas. The two posed as father and son in their travels, using false passports. According to Ali's asylum application, he traveled through Turkey, France, and the United Kingdom to reach the United States. During his testimony, he added that he also traveled through Canada.[1]

In Canada, the two encountered problems. Customs agents confiscated their passports and instructed the pair to return to the airport three days later. When the duo returned, the agents explained that they merely wanted to verify the identities on the passports. Ali and Sharas resumed their journey thereafter.

On June 21, 2001, Ali reached the United States by way of New York. He subsequently moved to Columbus, Ohio, moving in with another one of his father's friends. Despite the fact that Ali never had a valid passport, he filed a police report claiming that he lost his passport so that he

---

[1] Apparently, Ali omitted this part of the journey from his asylum application because Sharas told him to never mention it.

could obtain a new one. The Pakistani consulate in New York provided a temporary passport after

Ali produced identification and a copy of his birth certificate.

Ali filed an asylum application on April 3, 2002. In 2004, Ali's father sent him documents

supporting his asylum claim; Ali stored these documents in his car. The car, however, was stolen

later that year, with its contents rendered irretrievable.

Nevertheless, Ali had photocopies of three documents: two police reports—both in

Urdu—detailing Ali's two arrests, as well as a Pakistani hospital memo, written in English,

confirming Ali's stay in the ICU.[2] The memo reads, in its entirety:

> This is certified that Mr. Ahmed Ali s/o Mr. Liaqhat Ali was brought to the hospital
> on 10 of January 2001, where he was under Dr. Iftikhar Cheerna, stayed in ICU for
> 3 days and was move to the private Room 15 Second floor. Our Records do not
> show any departure date. according to Police of Gulshan Ravi, Mr. Ahmed Ali was
> guilty of a crime and ran away from the Window.

To further support his asylum application, Ali submitted a letter from Tariq, describing the

future persecution that Ali might be subjected to if he were to return to Pakistan. For his return

address, Tariq listed the family home in Pakistan. He wrote:

> I am keeping you [up to date] about the political situation here in Pakistan. Current
> [government] is giving hard time to protestors. I heard one of your close friend died
> inside the jail. I am requesting you not to come back here till present Gov't is in
> power place, your life here will be in big danger.
>
> I will keep you update about political situation. Once again don't come back here,
> till you hear from me.

---

[2] Ali explained that the medical record was in English—as opposed to Urdu like the police
reports—because all Pakistani medical documents are in English.

Ali did not submit the envelope that delivered his brother's letter.

In 2007, Ali married a U.S. citizen. They have two children together. Evidently, the marriage did not go over well with Ali's father, who severed relations with Ali. Other members of the family were also displeased about the marriage.

The Department of Homeland Security (DHS) served Ali with a Notice to Appear on June 18, 2008. Ali conceded all factual allegations and did not contest removability. He requested asylum, withholding of removal, and protection under the U.N. Convention Against Torture.

The immigration judge (IJ) denied relief. Six inconsistencies between Ali's testimony and asylum application led the IJ to conclude that Ali was not credible. First, Ali failed to mention on his asylum application that he traveled through Canada during his trip from Pakistan to the United States—this fact had only surfaced during his testimony. Second, Ali had no scar from the injury allegedly inflicted by a police officer during his detention—an injury that purportedly required eight stitches. Third, Tariq's letter sounded as if it was sent from Pakistan, despite Ali's testimony that Tariq was living in Spain at the time. Fourth, the medical record detailing Ali's hospital stay was written in English, instead of Urdu like the two police reports. Fifth, the IJ noted that Ali filed a false police report to obtain a replacement Pakistani passport while in the United States. Finally, during his asylum proceedings, Ali twice testified that his "best language" was Hindi, but he later testified that he spoke Urdu, not Hindi.[3]

---

[3] The IJ conceded that the language inconsistency did not go to the heart of Ali's claim.

After deeming Ali not credible, the IJ determined that Ali needed to provide corroborating evidence of his claims. He noted Ali's failure to produce several reasonably-available documents: (1) the 2004 police report regarding Ali's stolen car; (2) new originals of the lost documents contained in the car; and (3) affidavits or supporting documents from friends or family confirming his political activities in Pakistan. The IJ reasoned that he was obliged to give "extremely limited weight" to the photocopied documents that Ali provided, as DHS was unable to verify their authenticity. In sum, the IJ found Ali not credible, construed the lack of corroborating documents to Ali's detriment, and denied his requests for relief.

Ali appealed to the Board of Immigration Appeals (BIA), challenging the IJ's determinations. However, he had no luck with the BIA either; it agreed with the IJ's assessment that Ali was not credible and that he failed to provide reasonably-available corroborative evidence. In upholding the IJ's adverse-credibility determination, the BIA focused on two inconsistencies: (1) the injury Ali received from a government official that purportedly required eight stitches but left no lasting scar; and (2) the questions raised by Tariq's letter—specifically, whether Ali's brother was in Pakistan or Spain. The BIA affirmed the IJ's decision in its entirety and dismissed Ali's appeal. Ali filed a timely petition for review.

## II.

"Because the BIA adopted and supplemented the IJ's decision, we review the opinion of the IJ in conjunction with the BIA's additional comments and discussion." *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1149 (6th Cir. 2010). We review both decisions to discern whether they were supported by substantial evidence. *Hachem v. Holder*, 656 F.3d 430, 434 (6th Cir. 2011) (citing

*Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005) (per curiam)). Under this deferential standard, we uphold factual determinations so long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)); *see Khalil v. Holder*, 369 F. App'x 709, 710 (6th Cir. 2010) (citing *Yu v. Ashcroft*, 364 F.3d 700, 703 n.2 (6th Cir. 2004)). We may only reverse the BIA's decision if the evidence not only supports, but *compels*, a contrary conclusion. *See Elias-Zacarias*, 502 U.S. at 481 n.1.

### A.

As Ali filed his asylum application before May 11, 2005, we review his adverse-credibility challenge under the standards in place prior to the enactment of the REAL ID Act of 2005. *Kocibelli v. Holder*, 340 F. App'x 264, 269 n.6 (6th Cir. 2009). Accordingly, to sustain an IJ's adverse-credibility determination, we must conclude that the IJ gave specific reasons for determining an applicant not credible, and that those reasons pertained to the heart of the asylum claim. *See Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004).

While Ali challenges all six factual bases for the IJ's adverse-credibility determination, we first turn to the two inconsistencies identified by the BIA: (1) the lack of a scar despite eight purported stitches and (2) the ambiguity as to Tariq's whereabouts. Here, both of the BIA's conclusions are supported by substantial evidence.

We start with Ali's claim that he received stitches on his head for an injury inflicted by the police, despite the corresponding lack of a scar. Because the IJ is not a medical doctor or expert, Ali asserts that the IJ engaged in improper speculation by commenting about the lack of a scar and using

it as a factual basis for the adverse-credibility determination. While it may be true that the IJ is not a doctor, he did not draw an unsubstantiated medical conclusion. Instead, he merely noted the difference between Ali's alleged injury and the physical evidence—namely, the lack of a corresponding scar—and drew an inference therefrom. An IJ may make such observations about the inconsistencies between an alleged past injury and the lack of indicia reflecting that injury on the applicant's body. *See Khalil*, 369 F. App'x at 711 (observing that "the poor fit between the physical evidence and the medical record" supported an IJ's doubts as to the cause and extent of an injury).

Moreover, Ali provided no documented evidence contradicting the IJ's determination. For instance, his hospital memo—which would naturally discuss treatment for any injuries resulting from his time at the police station—said nothing about an injury. As Ali does not point to any corroborative evidence that would cause us to question the IJ's observation of an inconsistency, the IJ's adverse-credibility determination in this regard is supported by substantial evidence. *See Gjinaj v. Ashcroft*, 119 F. App'x 764, 771-72 (6th Cir. 2005) (affirming an IJ's adverse-credibility determination in light of no corroborating evidence to the contrary); *see also Ma v. Att'y Gen. of U.S.*, 482 F. App'x 727, 730 (3d Cir. 2012) (upholding an IJ's determination that an asylum applicant was inconsistent about the existence of certain injuries and basing affirmance on submitted medical records).

We draw the same conclusion about the IJ's assessment of Tariq's letter. Ali claims that "[i]t is impossible to tell exactly where Petitioner's brother was when the letter was written." Therefore, he reasons, the IJ and the BIA could not have concluded that his brother was in Pakistan; ergo, the

letter's ambiguity as to Tariq's location prevented it from serving as the basis for an adverse-credibility determination. We disagree.

Ali started with the premise that his brother lived in Spain. When confronted about the letter, he adamantly stated that Tariq sent the letter from Spain. But nothing in the letter itself indicates this. Tariq's return address is listed as a Pakistani address. The language of the letter suggested that Tariq was writing from Pakistan by using phrases such as "don't come back here" and "your life here." On the whole, it appears that the letter was written in Pakistan, with nothing—save Ali's testimony—to suggest that it came from Spain.

Perhaps, as Ali suggests, his brother "followed the situation in Pakistan at that time by communicating with his family there" and used the information derived therefrom as the basis for his letter to Ali. Even if we agreed that such a circumstance was plausible, a plausible explanation for an inconsistency, standing alone, is not enough for us to reverse an IJ's adverse-credibility determination. *See Shkabari v. Gonzales*, 427 F.3d 324, 330 (6th Cir. 2005). Hence, we are compelled to conclude that substantial evidence supported the IJ's observation of an inconsistency arising from Tariq's letter.

These two inconsistencies are supported by substantial evidence, and they alone can sustain the IJ's adverse-credibility determination. Hence, we have little need to discuss the other inconsistencies found by the IJ but left unaddressed by the BIA. *See Win v. Mukasey*, 303 F. App'x 336, 344 (6th Cir. 2008) ("The above inconsistencies . . . are sufficient to support the IJ's adverse credibility determination. Thus, there is no need to address . . . additional arguments about other inconsistencies." (citing *Xhamxhi v. Gonzales*, 188 F. App'x 472, 476 (6th Cir. 2006))).

B.

After rendering an adverse-credibility determination, the IJ concluded that Ali needed to provide reasonably-available corroborative evidence. Regardless of whether an applicant is credible or not credible, if it is "reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided. . . . The absence of such corroborating evidence can lead to a finding that an applicant has failed to meet [his] burden of proof." *Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004) (quoting *In re S-M-J-*, 21 I. & N. Dec. 722, 724-26 (BIA 1997)); *see also Diallo v. Holder*, 312 F. App'x 790, 801 (6th Cir. 2009) (observing that, in light of an adverse-credibility determination premised on inconsistencies between an asylum seeker's application and testimony, "the IJ was entitled to require [the applicant] to provide additional corroborating evidence"). To reverse an IJ's determination as to the availability of corroborating evidence, we must be able to find that a "reasonable trier of fact [would be] compelled to conclude that such corroborating evidence is unavailable." *See Win*, 303 F. App'x at 344 (quoting 8 U.S.C. § 1252(b)(4)); *see also Shkabari*, 427 F.3d at 331 n.2 (noting the retroactivity of § 1252(b)(4) to pre-REAL ID Act cases).

We cannot make such a finding here. The IJ determined that Ali failed to provide three reasonably-accessible documents to corroborate his claims: (1) a 2004 police report regarding his stolen car; (2) new originals of the photocopies he submitted in support of his asylum application; and (3) affidavits or other supporting documents from friends or family proving his political activities in Pakistan. Ali argues that, for a number of reasons, these documents are unobtainable. We disagree.

We start with the police report. Despite Ali's emphatic insistence that obtaining the report was an unreasonable endeavor, nothing in the record suggests to us that it was unavailable to him. Ali offered no documented evidence showing that he attempted to request (or otherwise access) the police report, nor did he offer any reason as to why acquiring the report was an impossible task. Instead, all we have is his speculative and conclusory arguments that (1) the report is unlikely to be available five years after the date of the incident (with no evidentiary proof to substantiate his assertion) and (2) the police report was unnecessary, as photocopies of the lost documents were provided. As nothing suggests that Ali even tried to procure the documents, the IJ's corroboration determination in this regard was correct. *See Shkabari*, 427 F.3d at 331 (construing the petitioner's failure to prove that she attempted to acquire her hospital record in an unfavorable manner).

As for the documents in the stolen car, Ali argues that a personal disagreement with his father about his marriage to a U.S. citizen prevented him from obtaining new originals to support his asylum claim. There is little merit to this assertion. Or, at the very least, there is no basis—save Ali's not credible testimony—to determine whether the alleged disagreement is plausible, let alone adequate to obviate corroboration. *See Dong v. Holder*, 345 F. App'x 965, 968, 970 (6th Cir. 2009) (upholding an IJ's corroboration determination where no evidence, other than the applicant's own testimony, was provided to explain an inconsistency). Given the dearth of substantiation, we can hardly say that we are *compelled* to find that the IJ's corroboration determination was incorrect. *See Rudzevich v. Holder*, 344 F. App'x 201, 206 (6th Cir. 2009).

Moreover, Ali did not sufficiently address why the documents were inaccessible prior to his marriage. When Ali was confronted about this during the asylum proceedings, he rejoined that he

did indeed ask his father for a new set of originals during this timeframe, but his father simply failed to send the documents. This also appears to be Ali's explanation for why he was unable to obtain documentation proving his political activities in Pakistan; he had asked a friend to procure such documentation just prior to the proceedings, but never received a thing.

When an asylum applicant claims that corroboration is not reasonably available, it is incumbent upon him to provide a reasonable explanation as to why such corroboration cannot be obtained. *He v. Holder*, 502 F. App'x 430, 434 (6th Cir. 2012). In this case, it may be true that Ali's father was not a reasonable source of corroborative evidence; Ali tried once, to no avail. If Ali's father was the only source of the documents, then perhaps a trier of fact could conclude that Ali's explanation on the unavailability of corroboration was reasonable. But here, the record shows that Ali kept in contact with various family members abroad, as well as "friends" in Pakistan. All of these individuals could have provided documents similar to the ones initially provided by his father, as well as proof of Ali's past political participation. But there is nothing to suggest that Ali asked them to do so, save for the requests made to his father and his "friend." Even if we accept Ali's argument that he has a strained relationship with some of his friends and family as a result of his marriage, Ali has still kept in touch with them—albeit sporadically. The fact that he has other available (yet perhaps seldom-used) avenues of obtaining corroboration means that it was reasonable to ask Ali to produce such corroboration, rendering his explanation of unavailability inadequate. *See Dorosh*, 398 F.3d at 383 (concluding that communication, for purposes of determining reasonable availability, need not be "convenient, regular, or private" to be sufficient). At a minimum, Ali should have reasonably explained why he was foreclosed from pursuing these other sources of

information.   As he failed to do so, substantial evidence supports the IJ's corroboration determination.

III.

Given that substantial evidence supports both the adverse-credibility and lack of corroboration determinations, Ali failed to meet his burden of proof for asylum, withholding of removal, and CAT relief.  *See Mullaj v. Mukasey*, 287 F. App'x 463, 467 (6th Cir. 2008).  We therefore **DENY** the petition for review.